# SUPREME COURT OF THE UNITED STATES

_____

No. 20A87

_____

## ROMAN CATHOLIC DIOCESE OF BROOKLYN, NEW YORK *v.* ANDREW M. CUOMO, GOVERNOR OF NEW YORK

ON APPLICATION FOR INJUNCTIVE RELIEF

[November 25,2020]

PER CURIAM.

The application for injunctive relief presented to JUSTICE BREYER and by him referred to the Court is granted. Respondent is enjoined from enforcing Executive Order 202.68's 10- and 25-person occupancy limits on applicant pending disposition of the appeal in the United States Court of Appeals for the Second Circuit and disposition of the petition for a writ of certiorari, if such writ is timely sought. Should the petition for a writ of certiorari be denied, this order shall terminate automatically. In the event the petition for a writ of certiorari is granted, the order shall terminate upon the sending down of the judgment of this Court.

\* \* \* \* \* \*

This emergency application and another, Agudath Israel of America, et al. v. Cuomo, No. 20A90, present the same issue, and this opinion addresses both cases.

Both applications seek relief from an Executive Order issued by the Governor of New York that imposes very severe restrictions on attendance at religious services in areas classified as "red" or "orange" zones. In red zones, no more than 10 persons may attend each religious service, and in orange zones, attendance is capped at 25. The two applications, one filed by the Roman Catholic Diocese of Brooklyn and the other by Agudath Israel of America and affiliated

entities, contend that these restrictions violate the Free Exercise Clause of the First Amendment, and they ask us to enjoin enforcement of the restrictions while they pursue appellate review. Citing a variety of remarks made by the Governor, Agudath Israel argues that the Governor specifically targeted the Orthodox Jewish community and gerrymandered the boundaries of red and orange zones to ensure that heavily Orthodox areas were included. Both the Diocese and Agudath Israel maintain that the regulations treat houses of worship much more harshly than comparable secular facilities. And they tell us without contradiction that they have complied with all public health guidance, have implemented additional precautionary measures, and have operated at 25% or 33% capacity for months without a single outbreak.

The applicants have clearly established their entitlement to relief pending appellate review. They have shown that their First Amendment claims are likely to prevail, that denying them relief would lead to irreparable injury, and that granting relief would not harm the public interest. See *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 20 (2008). Because of the need to issue an order promptly, we provide only a brief summary of the reasons why immediate relief is essential.

*Likelihood of success on the merits.* The applicants have made a strong showing that the challenged restrictions violate "the minimum requirement of neutrality" to religion. *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 533 (1993). As noted by the dissent in the court below, statements made in connection with the challenged rules can be viewed as targeting the "'ultra-Orthodox [Jewish] community.'" ___ F. 3d ___, ___, 2020 WL 6750495, *5 (CA2, Nov. 9, 2020) (Park, J., dissenting). But even if we put those comments aside, the regulations cannot be viewed

as neutral because they single out houses of worship for es-
pecially harsh treatment.[1]

In a red zone, while a synagogue or church may not admit
more than 10 persons, businesses categorized as "essential"
may admit as many people as they wish. And the list of
"essential" businesses includes things such as acupuncture
facilities, camp grounds, garages, as well as many whose
services are not limited to those that can be regarded as es-
sential, such as all plants manufacturing chemicals and mi-
croelectronics and all transportation facilities. See New
York State, Empire State Development, Guidance for De-
termining Whether a Business Enterprise is Subject to a
Workforce Reduction Under Recent Executive Orders,
https://esd.ny.gov/guidance-executive-order-2026. The dis-
parate treatment is even more striking in an orange zone.
While attendance at houses of worship is limited to 25 per-
sons, even non-essential businesses may decide for them-
selves how many persons to admit.

These categorizations lead to troubling results. At the
hearing in the District Court, a health department official
testified about a large store in Brooklyn that could "literally
have hundreds of people shopping there on any given day."
App. to Application in No. 20A87, Exh. D, p. 83. Yet a
nearby church or synagogue would be prohibited from al-
lowing more than 10 or 25 people inside for a worship ser-
vice. And the Governor has stated that factories and
schools have contributed to the spread of COVID–19, *id.*,
Exh. H, at 3; App. to Application in No. 20A90, pp. 98, 100,
but they are treated less harshly than the Diocese's
churches and Agudath Israel's synagogues, which have ad-
mirable safety records.

Because the challenged restrictions are not "neutral" and

———————

[1] Compare *Trump* v. *Hawaii*, 585 U. S. ___, ___ (2018) (slip op., at 29)
(directive "neutral on its face").

of "general applicability," they must satisfy "strict scrutiny," and this means that they must be "narrowly tailored" to serve a "compelling" state interest. *Church of Lukumi*, 508 U. S., at 546.  Stemming the spread of COVID–19 is unquestionably a compelling interest, but it is hard to see how the challenged regulations can be regarded as "narrowly tailored."  They are far more restrictive than any COVID–related regulations that have previously come before the Court,[2] much tighter than those adopted by many other jurisdictions hard-hit by the pandemic, and far more severe than has been shown to be required to prevent the spread of the virus at the applicants' services.  The District Court noted that "there ha[d] not been any COVID–19 outbreak in any of the Diocese's churches since they reopened," and it praised the Diocese's record in combatting the spread of the disease. ___ F. Supp. 3d ___, ___, 2020 WL 6120167, *2 (EDNY, Oct. 16, 2020).  It found that the Diocese had been constantly "ahead of the curve, enforcing stricter safety protocols than the State required." *Ibid.*  Similarly, Agudath Israel notes that "[t]he Governor does not dispute that [it] ha[s] rigorously implemented and adhered to all health protocols and that there has been no outbreak of COVID–19 in [its] congregations."  Application in No. 20A90, at 36.

Not only is there no evidence that the applicants have contributed to the spread of COVID–19 but there are many other less restrictive rules that could be adopted to minimize the risk to those attending religious services.  Among other things, the maximum attendance at a religious service could be tied to the size of the church or synagogue.  Almost all of the 26 Diocese churches immediately affected

---

[2] See *Calvary Chapel Dayton Valley* v. *Sisolak*, 591 U. S. ___ (2020) (directive limiting in-person worship services to 50 people); *South Bay United Pentecostal Church* v. *Newsom*, 590 U. S. ___ (2020) (Executive Order limiting in-person worship to 25% capacity or 100 people, whichever was lower).

by the Executive Order can seat at least 500 people, about 14 can accommodate at least 700, and 2 can seat over 1,000. Similarly, Agudath Israel of Kew Garden Hills can seat up to 400. It is hard to believe that admitting more than 10 people to a 1,000–seat church or 400–seat synagogue would create a more serious health risk than the many other activities that the State allows.

*Irreparable harm.* There can be no question that the challenged restrictions, if enforced, will cause irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod* v. *Burns*, 427 U. S. 347, 373 (1976) (plurality opinion). If only 10 people are admitted to each service, the great majority of those who wish to attend Mass on Sunday or services in a synagogue on Shabbat will be barred. And while those who are shut out may in some instances be able to watch services on television, such remote viewing is not the same as personal attendance. Catholics who watch a Mass at home cannot receive communion, and there are important religious traditions in the Orthodox Jewish faith that require personal attendance. App. to Application in No. 20A90, at 26–27.

*Public interest.* Finally, it has not been shown that granting the applications will harm the public. As noted, the State has not claimed that attendance at the applicants' services has resulted in the spread of the disease. And the State has not shown that public health would be imperiled if less restrictive measures were imposed.

Members of this Court are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area. But even in a pandemic, the Constitution cannot be put away and forgotten. The restrictions at issue here, by effectively barring many from attending religious services, strike at the very heart of the First Amendment's guarantee of religious liberty. Before allowing this to occur, we have a duty to conduct a serious

examination of the need for such a drastic measure.

The dissenting opinions argue that we should withhold relief because the relevant circumstances have now changed. After the applicants asked this Court for relief, the Governor reclassified the areas in question from orange to yellow, and this change means that the applicants may hold services at 50% of their maximum occupancy. The dissents would deny relief at this time but allow the Diocese and Agudath Israel to renew their requests if this recent reclassification is reversed.

There is no justification for that proposed course of action. It is clear that this matter is not moot. See *Federal Election Comm'n* v. *Wisconsin Right to Life, Inc.*, 551 U. S. 449, 462 (2007); *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 189 (2000). And injunctive relief is still called for because the applicants remain under a constant threat that the area in question will be reclassified as red or orange. See, *e.g.*, *Susan B. Anthony List* v. *Driehaus*, 573 U. S. 149, 158 (2014). The Governor regularly changes the classification of particular areas without prior notice.[3] If that occurs again, the reclassification will almost certainly bar individuals in the affected area from attending services before judicial relief can be obtained. At most Catholic churches, Mass is celebrated daily, and "Orthodox Jews pray in [Agudath Israel's] synagogues every day." Application in No. 20A90, at 4. Moreover, if reclassification occurs late in a week, as has happened in the past, there may not be time for applicants to seek and obtain relief from this Court before another Sabbath passes. Thirteen days have gone by since the Diocese filed its application, and Agudath Israel's application was filed over a week ago. While we could presumably act more

---

[3] Recent changes were made on the following dates: Monday, November 23; Thursday, November 19; Wednesday, November 18; Wednesday, November 11; Monday, November 9; Friday, November 6; Wednesday, October 28; Wednesday, October 21.

Per Curiam

swiftly in the future, there is no guarantee that we could provide relief before another weekend passes. The applicants have made the showing needed to obtain relief, and there is no reason why they should bear the risk of suffering further irreparable harm in the event of another reclassification.

For these reasons, we hold that enforcement of the Governor's severe restrictions on the applicants' religious services must be enjoined.

*It is so ordered.*

1

# SUPREME COURT OF THE UNITED STATES

———————

No. 20A87

———————

## ROMAN CATHOLIC DIOCESE OF BROOKLYN, NEW YORK *v.* ANDREW M. CUOMO, GOVERNOR OF NEW YORK

### ON APPLICATION FOR INJUNCTIVE RELIEF

[November 25, 2020]

JUSTICE GORSUCH, concurring.

Government is not free to disregard the First Amendment in times of crisis. At a minimum, that Amendment prohibits government officials from treating religious exercises worse than comparable secular activities, unless they are pursuing a compelling interest and using the least restrictive means available. See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 546 (1993). Yet recently, during the COVID pandemic, certain States seem to have ignored these long-settled principles.

Today's case supplies just the latest example. New York's Governor has asserted the power to assign different color codes to different parts of the State and govern each by executive decree. In "red zones," houses of worship are all but closed—limited to a maximum of 10 people. In the Orthodox Jewish community that limit might operate to exclude all women, considering 10 men are necessary to establish a *minyan*, or a quorum. In "orange zones," it's not much different. Churches and synagogues are limited to a maximum of 25 people. These restrictions apply even to the largest cathedrals and synagogues, which ordinarily hold hundreds. And the restrictions apply no matter the precautions taken, including social distancing, wearing masks, leaving doors and windows open, forgoing singing, and disinfecting spaces between services.

At the same time, the Governor has chosen to impose *no* capacity restrictions on certain businesses he considers "essential." And it turns out the businesses the Governor considers essential include hardware stores, acupuncturists, and liquor stores. Bicycle repair shops, certain signage companies, accountants, lawyers, and insurance agents are all essential too. So, at least according to the Governor, it may be unsafe to go to church, but it is always fine to pick up another bottle of wine, shop for a new bike, or spend the afternoon exploring your distal points and meridians. Who knew public health would so perfectly align with secular convenience?

As almost everyone on the Court today recognizes, squaring the Governor's edicts with our traditional First Amendment rules is no easy task. People may gather inside for extended periods in bus stations and airports, in laundromats and banks, in hardware stores and liquor shops. No apparent reason exists why people may not gather, subject to identical restrictions, in churches or synagogues, especially when religious institutions have made plain that they stand ready, able, and willing to follow all the safety precautions required of "essential" businesses and perhaps more besides. The only explanation for treating religious places differently seems to be a judgment that what happens there just isn't as "essential" as what happens in secular spaces. Indeed, the Governor is remarkably frank about this: In his judgment laundry and liquor, travel and tools, are all "essential" while traditional religious exercises are not. *That* is exactly the kind of discrimination the First Amendment forbids.

Nor is the problem an isolated one. In recent months, certain other Governors have issued similar edicts. At the flick of a pen, they have asserted the right to privilege restaurants, marijuana dispensaries, and casinos over churches, mosques, and temples. See *Calvary Chapel Dayton Valley* v. *Sisolak*, 591 U. S. ___, ___ (2020) (GORSUCH,

J., dissenting). In far too many places, for far too long, our first freedom has fallen on deaf ears.

\*

What could justify so radical a departure from the First Amendment's terms and long-settled rules about its application? Our colleagues offer two possible answers. Initially, some point to a solo concurrence in *South Bay Pentecostal Church* v. *Newsom*, 590 U. S. \_\_\_ (2020), in which THE CHIEF JUSTICE expressed willingness to defer to executive orders in the pandemic's early stages based on the newness of the emergency and how little was then known about the disease. *Post*, at 5 (opinion of BREYER, J.). At that time, COVID had been with us, in earnest, for just three months. Now, as we round out 2020 and face the prospect of entering a second calendar year living in the pandemic's shadow, that rationale has expired according to its own terms. Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical. Rather than apply a nonbinding and expired concurrence from *South Bay*, courts must resume applying the Free Exercise Clause. Today, a majority of the Court makes this plain.

Not only did the *South Bay* concurrence address different circumstances than we now face, that opinion was mistaken from the start. To justify its result, the concurrence reached back 100 years in the U. S. Reports to grab hold of our decision in *Jacobson* v. *Massachusetts*, 197 U. S. 11 (1905). But *Jacobson* hardly supports cutting the Constitution loose during a pandemic. That decision involved an entirely different mode of analysis, an entirely different right, and an entirely different kind of restriction.

Start with the mode of analysis. Although *Jacobson* predated the modern tiers of scrutiny, this Court essentially applied rational basis review to Henning Jacobson's challenge to a state law that, in light of an ongoing smallpox pandemic, required individuals to take a vaccine, pay a $5

fine, or establish that they qualified for an exemption. *Id.*, at 25 (asking whether the State's scheme was "reasonable"); *id.*, at 27 (same); *id.*, at 28 (same). Rational basis review is the test this Court *normally* applies to Fourteenth Amendment challenges, so long as they do not involve suspect classifications based on race or some other ground, or a claim of fundamental right. Put differently, *Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so. Instead, *Jacobson* applied what would become the traditional legal test associated with the right at issue—exactly what the Court does today. Here, that means strict scrutiny: The First Amendment traditionally requires a State to treat religious exercises at least as well as comparable secular activities unless it can meet the demands of strict scrutiny—showing it has employed the most narrowly tailored means available to satisfy a compelling state interest. *Church of Lukumi*, 508 U. S., at 546.

Next, consider the right asserted. Mr. Jacobson claimed that he possessed an implied "substantive due process" right to "bodily integrity" that emanated from the Fourteenth Amendment and allowed him to avoid not only the vaccine but *also* the $5 fine (about $140 today) *and* the need to show he qualified for an exemption. 197 U. S., at 13–14. This Court disagreed. But what does that have to do with our circumstances? Even if judges may impose emergency restrictions on rights that some of them have found hiding in the Constitution's penumbras, it does not follow that the same fate should befall the textually explicit right to religious exercise.

Finally, consider the different nature of the restriction. In *Jacobson*, individuals could accept the vaccine, pay the fine, or identify a basis for exemption. *Id.*, at 12, 14. The imposition on Mr. Jacobson's claimed right to bodily integrity, thus, was avoidable and relatively modest. It easily

survived rational basis review, and might even have survived strict scrutiny, given the opt-outs available to certain objectors. *Id.*, at 36, 38–39. Here, by contrast, the State has effectively sought to ban all traditional forms of worship in affected "zones" whenever the Governor decrees and for as long as he chooses. Nothing in *Jacobson* purported to address, let alone approve, such serious and long-lasting intrusions into settled constitutional rights. In fact, *Jacobson* explained that the challenged law survived only because it did not "contravene the Constitution of the United States" or "infringe any right granted or secured by that instrument." *Id.*, at 25.

Tellingly no Justice now disputes any of these points. Nor does any Justice seek to explain why anything other than our usual constitutional standards should apply during the current pandemic. In fact, today the author of the *South Bay* concurrence even downplays the relevance of *Jacobson* for cases like the one before us. *Post*, at 2 (opinion of ROBERTS, C. J.). All this is surely a welcome development. But it would require a serious rewriting of history to suggest, as THE CHIEF JUSTICE does, that the *South Bay* concurrence never really relied in significant measure on *Jacobson*. That was the first case *South Bay* cited on the substantive legal question before the Court, it was the only case cited involving a pandemic, and many lower courts quite understandably read its invocation as inviting them to slacken their enforcement of constitutional liberties while COVID lingers. See, *e.g., Elim Romanian Pentecostal Church* v. *Pritzker*, 962 F. 3d 341, 347 (CA7 2020); *Legacy Church, Inc.* v. *Kunkel*, ___ F. Supp. 3d ___, ___ (NM 2020).

Why have some mistaken this Court's modest decision in *Jacobson* for a towering authority that overshadows the Constitution during a pandemic? In the end, I can only surmise that much of the answer lies in a particular judicial impulse to stay out of the way in times of crisis. But if that impulse may be understandable or even admirable in other

circumstances, we may not shelter in place when the Constitution is under attack. Things never go well when we do.

*

That leaves my colleagues to their second line of argument. Maybe precedent does not support the Governor's actions. Maybe those actions do violate the Constitution. But, they say, we should stay our hand all the same. Even if the churches and synagogues before us have been subject to unconstitutional restrictions for months, it is no matter because, just the other day, the Governor changed his color code for Brooklyn and Queens where the plaintiffs are located. Now those regions are "yellow zones" and the challenged restrictions on worship associated with "orange" and "red zones" do not apply. So, the reasoning goes, we should send the plaintiffs home with an invitation to return later if need be.

To my mind, this reply only advances the case for intervention. It has taken weeks for the plaintiffs to work their way through the judicial system and bring their case to us. During all this time, they were subject to unconstitutional restrictions. Now, just as this Court was preparing to act on their applications, the Governor loosened his restrictions, all while continuing to assert the power to tighten them again anytime as conditions warrant. So if we dismissed this case, nothing would prevent the Governor from reinstating the challenged restrictions tomorrow. And by the time a new challenge might work its way to us, he could just change them again. The Governor has fought this case at every step of the way. To turn away religious leaders bringing meritorious claims just because the Governor decided to hit the "off" switch in the shadow of our review would be, in my view, just another sacrifice of fundamental rights in the name of judicial modesty.

Even our dissenting colleagues do not suggest this case is

moot or otherwise outside our power to decide. They counsel delay only because "the disease-related circumstances [are] rapidly changing." *Post*, at 5 (opinion of BREYER, J.). But look at what those "rapidly changing" circumstances suggest. Both Governor Cuomo and Mayor de Blasio have "indicated it's only a matter of time before [all] five boroughs" of New York City are flipped from yellow to orange. J. Skolnik, D. Goldiner, & D. Slattery, Staten Island Goes 'Orange' As Cuomo Urges Coronavirus 'Reality Check' Ahead of Thanksgiving, N. Y. Daily News (Nov. 23, 2020), https://www.nydailynews.com/coronavirus/ny-coronavirus-cuomo-thanksgiving-20201123-yyhxfo3kzbdinbfbsqos3tvrku-story-html. On anyone's account, then, it seems inevitable this dispute will require the Court's attention.

It is easy enough to say it would be a small thing to require the parties to "refile their applications" later. *Post*, at 3 (opinion of BREYER, J.). But none of us are rabbis wondering whether future services will be disrupted as the High Holy Days were, or priests preparing for Christmas. Nor may we discount the burden on the faithful who have lived for months under New York's unconstitutional regime unable to attend religious services. Whether this Court could decide a renewed application promptly is beside the point. The parties before us have already shown their entitlement to relief. Saying so now will establish clear legal rules and enable both sides to put their energy to productive use, rather than devoting it to endless emergency litigation. Saying so now will dispel, as well, misconceptions about the role of the Constitution in times of crisis, which have already been permitted to persist for too long.

It is time—past time—to make plain that, while the pandemic poses many grave challenges, there is no world in which the Constitution tolerates color-coded executive edicts that reopen liquor stores and bike shops but shutter churches, synagogues, and mosques.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20A87

_____

ROMAN CATHOLIC DIOCESE OF BROOKLYN,
NEW YORK *v.* ANDREW M. CUOMO,
GOVERNOR OF NEW YORK

ON APPLICATION FOR INJUNCTIVE RELIEF

[November 25, 2020]

JUSTICE KAVANAUGH, concurring.

I vote to grant the applications of the Roman Catholic Diocese of Brooklyn and Agudath Israel of America for temporary injunctions against New York's 10-person and 25-person caps on attendance at religious services. On this record, temporary injunctions are warranted because New York's severe caps on attendance at religious services likely violate the First Amendment. Importantly, the Court's orders today are not final decisions on the merits. Instead, the Court simply grants *temporary* injunctive relief until the Court of Appeals in December, and then this Court as appropriate, can more fully consider the merits.

To begin with, New York's 10-person and 25-person caps on attendance at religious services in red and orange zones (which are areas where COVID–19 is more prevalent) are much more severe than most other States' restrictions, including the California and Nevada limits at issue in *South Bay United Pentecostal Church* v. *Newsom*, 590 U. S. ___ (2020), and *Calvary Chapel Dayton Valley* v. *Sisolak*, 591 U. S. ___ (2020). In *South Bay*, houses of worship were limited to 100 people (or, in buildings with capacity of under 400, to 25% of capacity). And in *Calvary*, houses of worship were limited to 50 people.

New York has gone much further. In New York's red zones, most houses of worship are limited to 10 people; in

orange zones, most houses of worship are limited to 25 people.  Those strict and inflexible numerical caps apply even to large churches and synagogues that ordinarily can hold hundreds of people and that, with social distancing and mask requirements, could still easily hold far more than 10 or 25 people.

Moreover, New York's restrictions on houses of worship not only are severe, but also are discriminatory.  In red and orange zones, houses of worship must adhere to numerical caps of 10 and 25 people, respectively, but those caps do not apply to some secular buildings in the same neighborhoods.  In a red zone, for example, a church or synagogue must adhere to a 10-person attendance cap, while a grocery store, pet store, or big-box store down the street does not face the same restriction.  In an orange zone, the discrimination against religion is even starker: Essential businesses and many non-essential businesses are subject to no attendance caps at all.

The State's discrimination against religion raises a serious First Amendment issue and triggers heightened scrutiny, requiring the State to provide a sufficient justification for the discrimination.  See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 537–538 (1993); *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 884 (1990).  But New York has not sufficiently justified treating houses of worship more severely than secular businesses.

The State argues that it has not impermissibly discriminated against religion because some secular businesses such as movie theaters must remain closed and are thus treated less favorably than houses of worship.  But under this Court's precedents, it does not suffice for a State to point out that, as compared to houses of worship, *some* secular businesses are subject to similarly severe or even more severe restrictions.  See *Lukumi*, 508 U. S., at 537–538; *Smith*, 494 U. S., at 884; see also *Calvary*, 591 U. S., at ___

(KAVANAUGH, J., dissenting from denial of application for injunctive relief) (slip op., at 7). Rather, once a State creates a favored class of businesses, as New York has done in this case, the State must justify why houses of worship are excluded from that favored class. Here, therefore, the State must justify imposing a 10-person or 25-person limit on houses of worship but not on favored secular businesses. See *Lukumi*, 508 U. S., at 537–538; *Smith*, 494 U. S., at 884. The State has not done so.

To be clear, the COVID–19 pandemic remains extraordinarily serious and deadly. And at least until vaccines are readily available, the situation may get worse in many parts of the United States. The Constitution "principally entrusts the safety and the health of the people to the politically accountable officials of the States." *South Bay*, 590 U. S., at ___ (ROBERTS, C. J., concurring in denial of application for injunctive relief) (slip op., at 2) (internal quotation marks and alteration omitted). Federal courts therefore must afford substantial deference to state and local authorities about how best to balance competing policy considerations during the pandemic. See *ibid.* But judicial deference in an emergency or a crisis does not mean wholesale judicial abdication, especially when important questions of religious discrimination, racial discrimination, free speech, or the like are raised.

In light of the devastating pandemic, I do not doubt the State's authority to impose tailored restrictions—even very strict restrictions—on attendance at religious services and secular gatherings alike. But the New York restrictions on houses of worship are not tailored to the circumstances given the First Amendment interests at stake. To reiterate, New York's restrictions on houses of worship are much more severe than the California and Nevada restrictions at issue in *South Bay* and *Calvary*, and much more severe than the restrictions that most other States are imposing

on attendance at religious services. And New York's restrictions discriminate against religion by treating houses of worship significantly worse than some secular businesses.

For those reasons, I agree with THE CHIEF JUSTICE that New York's "[n]umerical capacity limits of 10 and 25 people . . . seem unduly restrictive" and that "it may well be that such restrictions violate the Free Exercise Clause." *Post*, at 1. I part ways with THE CHIEF JUSTICE on a narrow procedural point regarding the timing of the injunctions. THE CHIEF JUSTICE would not issue injunctions at this time. As he notes, the State made a change in designations a few days ago, and now none of the churches and synagogues who are applicants in these cases are located in red or orange zones. As I understand it, THE CHIEF JUSTICE would not issue an injunction unless and until a house of worship applies for an injunction and is still in a red or orange zone on the day that the injunction is finally issued. But the State has not withdrawn or amended the relevant Executive Order. And the State does not suggest that the applicants lack standing to challenge the red-zone and orange-zone caps imposed by the Executive Order, or that these cases are moot or not ripe. In other words, the State does not deny that the applicants face an imminent injury *today*. In particular, the State does not deny that some houses of worship, including the applicants here, are located in areas that likely will be classified as red or orange zones in the very near future. I therefore see no jurisdictional or prudential barriers to issuing the injunctions now.

There also is no good reason to delay issuance of the injunctions, as I see it. If no houses of worship end up in red or orange zones, then the Court's injunctions today will impose no harm on the State and have no effect on the State's response to COVID–19. And if houses of worship end up in red or orange zones, as is likely, then today's injunctions will ensure that religious organizations are not subjected to

the unconstitutional 10-person and 25-person caps. More-over, issuing the injunctions now rather than a few days from now not only will ensure that the applicants' constitu-tional rights are protected, but also will provide some needed clarity for the State and religious organizations.

\*    \*    \*

On this record, the applicants have shown: a likelihood that the Court would grant certiorari and reverse; irrepa-rable harm; and that the equities favor injunctive relief. I therefore vote to grant the applications for temporary in-junctive relief until the Court of Appeals in December, and then this Court as appropriate, can more fully consider the merits.

# SUPREME COURT OF THE UNITED STATES

No. 20A87

## ROMAN CATHOLIC DIOCESE OF BROOKLYN, NEW YORK *v.* ANDREW M. CUOMO, GOVERNOR OF NEW YORK

ON APPLICATION FOR INJUNCTIVE RELIEF

[November 25, 2020]

CHIEF JUSTICE ROBERTS, dissenting.

I would not grant injunctive relief under the present circumstances. There is simply no need to do so. After the Diocese and Agudath Israel filed their applications, the Governor revised the designations of the affected areas. None of the houses of worship identified in the applications is now subject to any fixed numerical restrictions. At these locations, the applicants can hold services with up to 50% of capacity, which is at least as favorable as the relief they currently seek.

Numerical capacity limits of 10 and 25 people, depending on the applicable zone, do seem unduly restrictive. And it may well be that such restrictions violate the Free Exercise Clause. It is not necessary, however, for us to rule on that serious and difficult question at this time. The Governor might reinstate the restrictions. But he also might not. And it is a significant matter to override determinations made by public health officials concerning what is necessary for public safety in the midst of a deadly pandemic. If the Governor does reinstate the numerical restrictions the applicants can return to this Court, and we could act quickly on their renewed applications. As things now stand, however, the applicants have not demonstrated their entitlement to "the extraordinary remedy of injunction."

*Nken* v. *Holder*, 556 U. S. 418, 428 (2009) (internal quotation marks omitted).  An order telling the Governor not to do what he's not doing fails to meet that stringent standard.

As noted, the challenged restrictions raise serious concerns under the Constitution, and I agree with JUSTICE KAVANAUGH that they are distinguishable from those we considered in *South Bay United Pentecostal Church* v. *Newsom*, 590 U. S. ___ (2020), and *Calvary Chapel Dayton Valley* v. *Sisolak*, 591 U. S. ___ (2020).  See *ante,* at 1, 3–4 (concurring opinion).  I take a different approach than the other dissenting Justices in this respect.

To be clear, I do not regard my dissenting colleagues as "cutting the Constitution loose during a pandemic," yielding to "a particular judicial impulse to stay out of the way in times of crisis," or "shelter[ing] in place when the Constitution is under attack."  *Ante,* at 3, 5–6 (opinion of GORSUCH, J.).  They simply view the matter differently after careful study and analysis reflecting their best efforts to fulfill their responsibility under the Constitution.

One solo concurrence today takes aim at my concurring opinion in *South Bay*.  See *ante,* at 3–6 (opinion of GORSUCH, J.).  Today's concurrence views that opinion with disfavor because "[t]o justify its result, [it] reached back 100 years in the U. S. Reports to grab hold of our decision in *Jacobson* v. *Massachusetts*, 197 U. S. 11 (1905)."  *Ante,* at 3.  Today's concurrence notes that *Jacobson* "was the first case *South Bay* cited on the substantive legal question before the Court," and "it was the only case cited involving a pandemic."  *Ante,* at 5.  And it suggests that, in the wake of *South Bay*, some have "mistaken this Court's modest decision in *Jacobson* for a towering authority that overshadows the Constitution during a pandemic."  *Ibid.*  But while *Jacobson* occupies three pages of today's concurrence, it warranted exactly one sentence in *South Bay*.  What did that one sentence say?  Only that "[o]ur Constitution principally entrusts '[t]he safety and the health of the people' to the

politically accountable officials of the States 'to guard and protect.'" *South Bay*, 590 U. S., at \_\_\_ (ROBERTS, C. J., concurring) (quoting *Jacobson*, 197 U. S., at 38). It is not clear which part of this lone quotation today's concurrence finds so discomfiting. The concurrence speculates that there is so much more to the sentence than meets the eye, invoking—among other interpretive tools—the new "first case cited" rule. But the actual proposition asserted should be uncontroversial, and the concurrence must reach beyond the words themselves to find the target it is looking for.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20A87

_____

## ROMAN CATHOLIC DIOCESE OF BROOKLYN, NEW YORK *v.* ANDREW M. CUOMO, GOVERNOR OF NEW YORK

ON APPLICATION FOR INJUNCTIVE RELIEF

[November 25, 2020]

JUSTICE BREYER, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

New York regulations designed to fight the rapidly spreading—and, in many cases, fatal—COVID–19 virus permit the Governor to identify hot spots where infection rates have spiked and to designate those hot spots as red zones, the immediately surrounding areas as orange zones, and the outlying areas as yellow zones. Brief in Opposition in No. 20A87, p. 12. The regulations impose restrictions within these zones (with the strictest restrictions in the red zones and the least strict restrictions in the yellow zones) to curb transmission of the virus and prevent spread into nearby areas. *Ibid.* In October, the Governor designated red, orange, and yellow zones in parts of Brooklyn and Queens. Brief in Opposition in *Agudath Israel of America* v. *Cuomo*, O. T. 2020, No. 20A90, pp. 10–11 (Brief in Opposition in No. 20A90). Among other things, the restrictions in these zones limit the number of persons who can be present at one time at a gathering in a house of worship to: the lesser of 10 people or 25% of maximum capacity in a red zone; the lesser of 25 people or 33% of maximum capacity in an orange zone; and 50% of maximum capacity in a yellow zone. *Id.,* at 8–9.

Both the Roman Catholic Diocese of Brooklyn and Agudath Israel of America (together with Agudath Israel of

Kew Garden Hills and its employee and Agudath Israel of Madison and its rabbi) brought lawsuits against the Governor of New York. They claimed that the fixed-capacity restrictions of 10 people in red zones and 25 people in orange zones were too strict—to the point where they violated the First Amendment's protection of the free exercise of religion. Both parties asked a Federal District Court for a preliminary injunction that would prohibit the State from enforcing these red and orange zone restrictions.

After receiving evidence and hearing witness testimony, the District Court in the Diocese's case found that New York's regulations were "crafted based on science and for epidemiological purposes." ___ F. Supp. 3d ___, ___, 2020 WL 6120167, *10 (EDNY, Oct. 16, 2020). It wrote that they treated "religious gatherings . . . more favorably than similar gatherings" with comparable risks, such as "public lectures, concerts or theatrical performances." *Id.,* at *9. The court also recognized the Diocese's argument that the regulations treated religious gatherings less favorably than what the State has called "essential businesses," including, for example, grocery stores and banks. *Ibid.* But the court found these essential businesses to be distinguishable from religious services and declined to "second guess the State's judgment about what should qualify as an essential business." *Ibid.* The District Court denied the motion for a preliminary injunction. The Diocese appealed, and the District Court declined to issue an emergency injunction pending that appeal. The Court of Appeals for the Second Circuit also denied the Diocese's request for an emergency injunction pending appeal, but it called for expedited briefing and scheduled a full hearing on December 18 to address the merits of the appeal. This Court, unlike the lower courts, has now decided to issue an injunction that would prohibit the State from enforcing its fixed-capacity restrictions on houses of worship in red and orange zones while the parties await the Second Circuit's decision. I cannot agree with

that decision.

For one thing, there is no need now to issue any such injunction. Those parts of Brooklyn and Queens where the Diocese's churches and the two applicant synagogues are located are no longer within red or orange zones. Brief in Opposition in No. 20A90, at 17. Thus, none of the applicants are now subject to the fixed-capacity restrictions that they challenge in their applications. The specific applicant houses of worship are now in yellow zones where they can hold services up to 50% of maximum capacity. And the applicants do not challenge any yellow zone restrictions, as the conditions in the yellow zone provide them with more than the relief they asked for in their applications.

Instead, the applicants point out that the State might reimpose the red or orange zone restrictions in the future. But, were that to occur, they could refile their applications here, by letter brief if necessary. And this Court, if necessary, could then decide the matter in a day or two, perhaps even in a few hours. Why should this Court act now without argument or full consideration in the ordinary course (and prior to the Court of Appeals' consideration of the matter) when there is no legal or practical need for it to do so? I have found no convincing answer to that question.

For another thing, the Court's decision runs contrary to ordinary governing law. We have previously said that an injunction is an "extraordinary remedy." *Nken* v. *Holder*, 556 U. S. 418, 428 (2009) (internal quotation marks omitted). That is especially so where, as here, the applicants seek an injunction prior to full argument and contrary to the lower courts' determination. Here, we consider severe restrictions. Those restrictions limit the number of persons who can attend a religious service to 10 and 25 congregants (irrespective of mask-wearing and social distancing). And those numbers are indeed low. But whether, in present circumstances, those low numbers violate the Constitution's Free Exercise Clause is far from clear, and, in my view, the

applicants must make such a showing here to show that they are entitled to "the extraordinary remedy of injunction." *Ibid.* (internal quotation marks omitted).

COVID–19 has infected more than 12 million Americans and caused more than 250,000 deaths nationwide. At least 26,000 of those deaths have occurred in the State of New York, with 16,000 in New York City alone. And the number of COVID–19 cases is many times the number of deaths. The Nation is now experiencing a second surge of infections. In New York, for example, the 7-day average of new confirmed cases per day has risen from around 700 at the end of the summer to over 4,800 last week. Nationwide, the number of new confirmed cases per day is now higher than it has ever been. Brief in Opposition in No. 20A87, at 1; COVID in the U. S.: Latest Map and Case Count (Nov. 24, 2020), http://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#states; New York COVID Map and Case Count (Nov. 24, 2020), http://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html.

At the same time, members of the scientific and medical communities tell us that the virus is transmitted from person to person through respiratory droplets produced when a person or group of people talk, sing, cough, or breathe near each other. Brief in Opposition in No. 20A87, at 3 (citing the World Health Organization); Brief of the American Medical Association as *Amici Curiae* 5–6. Thus, according to experts, the risk of transmission is higher when people are in close contact with one another for prolonged periods of time, particularly indoors or in other enclosed spaces. *Id.,* at 3–6. The nature of the epidemic, the spikes, the uncertainties, and the need for quick action, taken together, mean that the State has countervailing arguments based upon health, safety, and administrative considerations that must be balanced against the applicants' First Amendment challenges. That fact, along with others that JUSTICE SOTOMAYOR describes, means that the applicants' claim of

a constitutional violation (on which they base their request for injunctive relief) is far from clear. See *post*, p. 1 (dissenting opinion). (All of these matters could be considered and discussed in the ordinary course of proceedings at a later date.) At the same time, the public's serious health and safety needs, which call for swift government action in ever changing circumstances, also mean that it is far from clear that "the balance of equities tips in [the applicants'] favor," or "that an injunction is in the public interest." *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 20 (2008).

Relevant precedent suggests the same. We have previously recognized that courts must grant elected officials "broad" discretion when they "undertake to act in areas fraught with medical and scientific uncertainties." *South Bay United Pentecostal Church* v. *Newsom*, 590 U. S. ___, ___ (2020) (ROBERTS, C. J., concurring) (slip op., at 2) (alteration omitted). That is because the "Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States." *Ibid.* (alterations and internal quotation marks omitted). The elected branches of state and national governments can marshal scientific expertise and craft specific policies in response to "changing facts on the ground." *Id.,* at 3. And they can do so more quickly than can courts. That is particularly true of a court, such as this Court, which does not conduct evidentiary hearings. It is true even more so where, as here, the need for action is immediate, the information likely limited, the making of exceptions difficult, and the disease-related circumstances rapidly changing.

I add that, in my view, the Court of Appeals will, and should, act expeditiously. The State of New York will, and should, seek ways of appropriately recognizing the religious interests here at issue without risking harm to the health and safety of the people of New York. But I see no practical

need to issue an injunction to achieve these objectives.  Rather, as I said, I can find no need for an immediate injunction.  I believe that, under existing law, it ought not to issue.  And I dissent from the Court's decision to the contrary.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20A87

_____

## ROMAN CATHOLIC DIOCESE OF BROOKLYN, NEW YORK *v.* ANDREW M. CUOMO, GOVERNOR OF NEW YORK

### ON APPLICATION FOR INJUNCTIVE RELIEF

[November 25, 2020]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN joins, dissenting.

Amidst a pandemic that has already claimed over a quarter million American lives, the Court today enjoins one of New York's public health measures aimed at containing the spread of COVID–19 in areas facing the most severe outbreaks. Earlier this year, this Court twice stayed its hand when asked to issue similar extraordinary relief. See *South Bay United Pentecostal Church* v. *Newsom*, 590 U. S. \_\_\_ (2020); *Calvary Chapel Dayton Valley* v. *Sisolak*, 591 U. S. \_\_\_ (2020). I see no justification for the Court's change of heart, and I fear that granting applications such as the one filed by the Roman Catholic Diocese of Brooklyn (Diocese) will only exacerbate the Nation's suffering.[1]

*South Bay* and *Calvary Chapel* provided a clear and workable rule to state officials seeking to control the spread of COVID–19: They may restrict attendance at houses of

_____

[1] Ironically, due to the success of New York's public health measures, the Diocese is no longer subject to the numerical caps on attendance it seeks to enjoin. See Brief in Opposition in *Agudath Israel of America* v. *Cuomo*, No. 20A90, p. 17. Yet the Court grants this application to ensure that, should infection rates rise once again, the Governor will be unable to reimplement the very measures that have proven so successful at allowing the free (and comparatively safe) exercise of religion in New York.

worship so long as comparable secular institutions face restrictions that are at least equally as strict. See *South Bay*, 590 U. S., at ___ (ROBERTS, C. J., concurring) (slip op., at 2). New York's safety measures fall comfortably within those bounds. Like the States in *South Bay* and *Calvary Chapel*, New York applies "[s]imilar or more severe restrictions . . . to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time." *Ibid.* Likewise, New York "treats more leniently only dissimilar activities, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods." *Ibid.* That should be enough to decide this case.

The Diocese attempts to get around *South Bay* and *Calvary Chapel* by disputing New York's conclusion that attending religious services poses greater risks than, for instance, shopping at big box stores. Application in No. 20A87, p. 23 (Application). But the District Court rejected that argument as unsupported by the factual record. ___, F. Supp. 3d ___, ___–___, 2020 WL 6120167, *8–*9 (EDNY, Oct. 16, 2020). Undeterred, JUSTICE GORSUCH offers up his own examples of secular activities he thinks might pose similar risks as religious gatherings, but which are treated more leniently under New York's rules (*e.g.,* going to the liquor store or getting a bike repaired). *Ante*, at 2 (concurring opinion). But JUSTICE GORSUCH does not even try to square his examples with the conditions medical experts tell us facilitate the spread of COVID–19: large groups of people gathering, speaking, and singing in close proximity indoors for extended periods of time. See App. to Brief in Opposition in No. 20A87, pp. 46–51 (declaration of Debra S. Blog, Director of the Div. of Epidemiology, NY Dept. of Health); Brief for the American Medical Association et al.

as *Amicus Curiae* 3–6 (Brief for AMA). Unlike religious services, which "have every one of th[ose] risk factors," Brief for AMA 6, bike repair shops and liquor stores generally do not feature customers gathering inside to sing and speak together for an hour or more at a time. *Id.,* at 7 ("Epidemiologists and physicians generally agree that religious services are among the riskiest activities"). Justices of this Court play a deadly game in second guessing the expert judgment of health officials about the environments in which a contagious virus, now infecting a million Americans each week, spreads most easily.

In truth, this case is easier than *South Bay* and *Calvary Chapel*. While the state regulations in those cases generally applied the same rules to houses of worship and secular institutions where people congregate in large groups, New York treats houses of worship far more favorably than their secular comparators. Compare, *e.g.*, *Calvary Chapel*, 591 U. S., at ___ (KAVANAUGH, J., dissenting) (slip op., at 8) (noting that Nevada subjected movie theaters and houses of worship alike to a 50-person cap) with App. to Brief in Opposition in No. 20A87, p. 53 (requiring movie theaters, concert venues, and sporting arenas subject to New York's regulation to close entirely, but allowing houses of worship to open subject to capacity restrictions). And whereas the restrictions in *South Bay* and *Calvary Chapel* applied statewide, New York's fixed-capacity restrictions apply only in specially designated areas experiencing a surge in COVID–19 cases.

The Diocese suggests that, because New York's regulation singles out houses of worship by name, it cannot be neutral with respect to the practice of religion. Application 22. Thus, the argument goes, the regulation must, *ipso facto*, be subject to strict scrutiny. It is true that New York's policy refers to religion on its face. But as I have just explained, that is because the policy singles out religious in-

stitutions for preferential treatment in comparison to secular gatherings, not because it discriminates against them. Surely the Diocese cannot demand laxer restrictions by pointing out that it is already being treated better than comparable secular institutions.[2]

Finally, the Diocese points to certain statements by Governor Cuomo as evidence that New York's regulation is impermissibly targeted at religious activity—specifically, at combatting heightened rates of positive COVID–19 cases among New York's Orthodox Jewish community. Application 24. The Diocese suggests that these comments supply "an independent basis for the application of strict scrutiny." Reply Brief in No. 20A87, p. 9. I do not see how. The Governor's comments simply do not warrant an application of strict scrutiny under this Court's precedents. Just a few Terms ago, this Court declined to apply heightened scrutiny to a Presidential Proclamation limiting immigration from Muslim-majority countries, even though President Trump had described the Proclamation as a "Muslim Ban," originally conceived of as a "'total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on.'" *Trump* v. *Hawaii*, 585 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 27). If the

―――――――

[2] JUSTICE KAVANAUGH cites *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 537–538 (1993), and *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 884 (1990), for the proposition that states must justify treating even noncomparable secular institutions more favorably than houses of worship. *Ante*, at 2 (concurring opinion). But those cases created no such rule. *Lukumi* struck down a law that allowed animals to be killed for almost any purpose other than animal sacrifice, on the ground that the law was a "'religious gerrymander'" targeted at the Santeria faith. 508 U. S*.*, at 535. *Smith* is even farther afield, standing for the entirely inapposite proposition that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." 494 U. S., at 879 (internal quotation marks omitted).

President's statements did not show "that the challenged restrictions violate the 'minimum requirement of neutrality' to religion," *ante*, at 2 (quoting *Lukumi*, 508 U. S., at 533), it is hard to see how Governor Cuomo's do.

\*  \*  \*

Free religious exercise is one of our most treasured and jealously guarded constitutional rights. States may not discriminate against religious institutions, even when faced with a crisis as deadly as this one. But those principles are not at stake today. The Constitution does not forbid States from responding to public health crises through regulations that treat religious institutions equally or more favorably than comparable secular institutions, particularly when those regulations save lives. Because New York's COVID–19 restrictions do just that, I respectfully dissent.