Matter of Ventresca-Cohen v DiFiore (2024 NY Slip Op 00664)

Matter of Ventresca-Cohen v DiFiore

2024 NY Slip Op 00664

Decided on February 8, 2024

Appellate Division, Third Department

Lynch, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:February 8, 2024

CV-23-0032

[*1]In the Matter of Nicole Ventresca-Cohen et al., Respondents-Appellants,
v
Janet DiFiore, as former Chief Judge, et al., Appellants-Respondents.

Calendar Date:November 13, 2023

Before: Egan Jr., J.P., Clark, Lynch, Ceresia and Fisher, JJ.

Anthony R. Perri, Office of Court Administration, New York City (Pedro Morales of counsel), for appellants-respondents.
Daren J. Rylewicz, Civil Service Employees Association, Inc., Albany (Steven M. Klein of counsel), for respondents-appellants.

Lynch, J.
Cross-appeals from an amended judgment of the Supreme Court (Denise A. Hartman, J.), entered November 7, 2022 in Albany County, which partially granted petitioners' application, in a proceeding pursuant to CPLR article 78, to review a determination of respondent Unified Court System denying petitioners' requests for religious exemptions from its policy regarding mandatory COVID-19 vaccinations.
In this CPLR article 78 proceeding, petitioners, 29 nonjudicial employees of respondent New York State Unified Court System (hereinafter UCS), challenge respondents' denial of their respective requests for a religious exemption from a mandatory COVID-19 vaccination program applicable to all USC employees (judicial and nonjudicial) implemented in September 2021. We emphasize, up front, that the validity of the vaccine mandate policy is not at issue in this proceeding. Instead, petitioners challenge the denial of their exemption applications as arbitrary and capricious. Supreme Court granted the petition to the extent of remitting the applications of 19 petitioners for further review, but otherwise denied the petition. Respondents appeal and petitioners cross-appeal.
When reviewing an administrative determination made without an evidentiary hearing, the issues are whether the determination "was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]; see Matter of Ward v City of Long Beach, 20 NY3d 1042, 1043 [2013]). " 'An action is arbitrary and capricious when it is taken without sound basis in reason or regard to the facts ' " (Matter of Ward v City of Long Beach, 20 NY3d at 1043, quoting Matter of Peckham v Calogero, 12 NY3d 424, 431 [2009]). "If the court finds that the determination is supported by a rational basis, it must sustain the determination even if the court concludes that it would have reached a different result than the one reached by the agency" (Matter of Peckham v Calogero, 12 NY3d at 431 [citation omitted]; see Matter of Ward v City of Long Beach, 20 NY3d at 1043).
Initially, we agree with Supreme Court that respondents' determination was not made in violation of lawful procedure. The central issue addressed during the application process was whether the exemption request was based on a sincerely held religious belief. In their verified petition, petitioners took issue with the fact that the denial letters did not include individualized explanations for the denials and UCS did not reveal its decision-making criteria for the determinations. However, respondents' answer, together with the affidavit of Justin Barry, the Chief of Administration for UCS and a member of the Vaccination Exemption Committee (hereinafter the Committee), outlined the evaluation process and provided a specific explanation for the denial of each application. Where, as here, there was no administrative hearing, respondents were entitled to submit Barry's affidavit to provide the [*2]relevant information and rationale for the Committee's decisions (see Matter of Gesmer v Administrative Bd. of the N.Y. State Unified Ct. Sys., 194 AD3d 180, 184 n 2 [3d Dept 2021], appeal dismissed 37 NY3d 1103 [2021]).
Turning to the substantive analysis, respondents acknowledge that under Title VII of the Civil Rights Act of 1964 (see 42 USC § 2000e et seq.), an employer is required to provide a reasonable accommodation to an employee when a work requirement conflicts with a bona fide religious belief of the employee (see 42 USC § 2000e [j]; Baker v The Home Depot, 445 F3d 541, 546 [2d Cir 2006]). Pertinent here, the vaccine mandate allowed for a religious exemption. In reviewing a religious exemption request, "the state is not entitled to evaluate the legitimacy of religious beliefs . . . [but] is permitted to assess whether a belief is sincerely held and religious in nature" (Ferrelli v State of N.Y. Unified Ct. Sys., 2022 WL 673863, *8, 2022 US Dist LEXIS 39929, *24 [ND NY, Mar. 7, 2022, No. 1:22-CV-0068 (LEK/CFH)]; see United States v Seeger, 380 US 163, 185 [1965]; Kane v de Blasio, 575 F Supp 3d 435, 442 [SD NY 2021]).
To implement the exemption process, Barry explained that the Committee first issued a two-page application form requiring an applicant to detail the religious basis for the exemption request. The Committee's initial review of multiple applications revealed two primary reasons for seeking the religious exemption: (1) the connection between fetal cells and the testing of COVID-19 vaccines; and (2) a concern about the sanctity or purity of the applicant's body. To further assess these concerns, the Committee created a supplemental form. Section A of this form "summarize[d] the current medical and scientific information regarding the COVID-19 vaccines and their development" utilizing fetal cell lines in the testing or manufacturing process. Applicants were required to address their past and future use of other commonly-used over-the-counter drugs, prescription medications and vaccinations also tested using fetal cell lines, and to explain any inconsistency. Section B required information as to the medicines, medical procedures, vaccinations and foods an applicant abstained from due to his or her religious beliefs. As the court in Ferrelli observed, "[t]his line of questioning does not presuppose the illegitimacy of concerns about use of fetal cell lines; it merely seeks to determine whether such concerns are the applicant's true motivation for seeking an exemption" (Ferrelli v State of N.Y. Unified Ct. Sys., 2022 WL 673863 at *8). We agree with that assessment.
The Committee formed two working groups to review the applications, with any recommended denial being reviewed by the full Committee. A "blind review" process was utilized, redacting the identity of the applicant. As Barry explained, "the review [was] solely to determine whether the applicant's opposition to being vaccinated [was] based on a sincerely held religious belief[*3]." In gauging sincerity, the Committee was entitled to factor in the consistency between an applicant's stated beliefs and conduct (see Philbrook v Ansonia Bd. of Educ., 757 F2d 476, 482 [2d Cir 1985], affd 479 US 60 [1986]). In other words, the legitimacy of an applicant's religious beliefs was not an issue. Rather, the Committee's inquiry concerned whether that belief was religious in nature and sincerely held.
Turning to the petitioners whose applications were remitted for further review, Supreme Court found that respondents irrationally adopted an "all-or-nothing" approach by concluding that these petitioners could not have rejected the vaccine on religious grounds, without also rejecting the use or contemplated use of other medications or vaccinations developed using the same fetal cell lines. Supreme Court reasoned that it would not be inconsistent for an applicant to continue and/or consider taking other medications "critical to their lives or well-being, such as thyroid medication or hydroxychloroquine." We disagree with Supreme Court's thesis. The very purpose of the vaccine mandate was to protect and preserve the public health by "[s]temming the spread of COVID-19[, which] is . . . a compelling interest" (Roman Catholic Diocese of Brooklyn v Cuomo, 592 US 14, 18 [2020]). From our perspective, the Committee could and did rationally conclude that an applicant's continued and/or contemplated use of other medications or vaccinations tested on fetal cell lines — including the current version of medications originating before fetal cell lines were developed, but now tested utilizing fetal cell lines — while refusing to take the COVID-19 vaccination on that very basis, reflected an inconsistency undermining the sincerity of that applicant's religious beliefs.
Turning to the cross-appeal, we agree with Supreme Court that respondents' denial of exemptions for the involved applicants was not arbitrary and capricious. In particular, we agree with Supreme Court's assessment that the decision to abstain from the COVID-19 vaccine by five of these applicants reflected a personal choice, unlike the six employees whose applications were submitted by petitioners for comparison purposes and whose exemption requests were granted on a clear religious basis. Nor did respondents err in denying the applications of two petitioners who gave only a generic response in the initial application without providing any detail as to the basis for their religious beliefs.[FN1] The remaining petitioners failed to fully respond to requests for information in the supplemental form.
Clark, Ceresia and Fisher, JJ., concur.
Egan Jr., J.P. (concurring in part and dissenting in part).
As I am unpersuaded that respondent New York State Unified Court System (hereinafter UCS) properly denied the applications of 19 of the petitioners who sought a religious exemption from the mandatory COVID-19 vaccination program, I respectfully dissent on that point and would vote to affirm Supreme [*4]Court's decision in all respects.
I agree with the majority that, pursuant to Title VII of the Civil Rights Act of 1964 (42 USC § 2000e et seq.), an employee is only entitled to seek a reasonable accommodation from an employer when his or her bona fide religious beliefs come into conflict with a work requirement (see 42 USC § 2000e [j]; Baker v The Home Depot, 445 F3d 541, 546 [2d Cir 2006]). This does not require the employee to prove the truth of his or her belief; well before the enactment of Title VII, it was understood that individuals "may believe what they cannot prove," and "the fact that [the truth of religious beliefs] may be beyond the ken of mortals does not mean that they can be made suspect before the law" (United States v Ballard, 322 US 78, 86-87 [1944]). The question is instead whether the belief is sincerely held and religious, which does not require that the belief be "acceptable, logical, consistent, or comprehensible to others" (Thomas v Review Bd. of Indiana Empl. Sec. Div., 450 US 707, 714 [1981]; accord Fulton v City of Philadelphia, Pa., 593 US ___, ___, 141 S Ct 1868, 1876 [2021]; see Equal Empl. Opportunity Commn. v UniÓn Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, 279 F3d 49, 55 [1st Cir 2002]) or that the individual harboring it exhibits "perfect consistency in [the belief's] observance, practice, and interpretation" (Adeyeye v Heartland Sweeteners, LLC, 721 F3d 444, 453 [7th Cir 2013]; see Philbrook v Ansonia Bd. of Educ., 757 F2d 476, 481-482 [2d Cir 1985], affd 479 US 60 [1986]).
The burden of establishing the existence of a sincere religious belief is not heavy and, indeed, an "employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief" and only seek additional information where there is "an objective basis for questioning either the religious nature or the sincerity of a particular belief, observance, or practice" (US Equal Empl Opportunity Commn, Office of Legal Counsel, Section 12: Religious Discrimination, available at https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination [last visited Jan. 23, 2024]; see Keene v City & County of San Francisco, 2023 WL 3451687, *2, 2023 US App LEXIS 11807, *5 [9th Cir 2023]; Bolden-Hardge v Office of Cal. State Controller, 63 F4th 1215, 1223 [9th Cir 2023]; US Equal Empl Opportunity Commn, Office of Legal Counsel, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, available at https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws [last visited Jan. 23, 2024]). A basis for denial would thereafter exist if the proof reflected, for example, that the employee's belief was "based, not on religious grounds, but on scientific and secular theories" (Mason v General Brown Cent. Sch. Dist., 851 F2d 47, 51 [2d Cir 1988]; see Wisconsin v Yoder, 406 US 205, 215-216 [1971[*5]]) or that the belief itself was feigned because the employee had previously "act[ed] in a manner inconsistent with" it (International Socy. for Krishna Consciousness, Inc. v Barber, 650 F2d 430, 441 [2d Cir 1981]; see Philbrook v Ansonia Bd. of Educ., 757 F2d at 482).
With the foregoing in mind, the record establishes that 19 petitioners who objected to vaccination on the ground that the available COVID-19 vaccines were derived from, or tested using, fetal cell lines detailed the religious basis for that objection in their initial applications. Although some of them cited other bases for their objection as well, they all explained, relying upon sacred texts, catechisms, statements by religious leaders in their faith traditions and/or their personal religious development, why they could not in good conscience receive the vaccines because of the connection between the vaccines and fetal cell lines. It would appear that those explanations sufficiently articulated a bona fide religious belief for the 19 petitioners' accommodation requests, and respondents made little effort to explain why they were not sufficient to articulate a sincere religious belief or point to any objective basis for doubt that would warrant additional, more intrusive, inquiry (see e.g. Stephens v Legacy GoHealth Urgent Care, 2023 WL 7612395, *8, 2023 US Dist LEXIS 204619, *20-21 [D Or, Oct. 23, 2023, No. 3:23-CV-00206-SB], adopted by 2023 WL 7623865, 2023 US LEXIS 203541 [D Or, Nov. 14, 2023]).[FN2] They nevertheless elected to provide a supplemental form to petitioners that, as the majority puts it, sought to "summarize the current medical and scientific information regarding the COVID-19 vaccines and their development" utilizing fetal cell lines in the testing or manufacturing process (majority op at 4). It then demanded that the applicants state whether they had used, or would use, other specified medications tested using fetal cell lines and vaccines produced and/or tested using fetal cell lines. The form further asked, if the applicants had used those products, why their religious beliefs barred the use of the COVID-19 vaccines.
The 19 petitioners who indicated that they either had used, or would use, medical products connected to fetal cell lines in some way offered one or more of the foregoing explanations for that use. In many cases, they explained that they would not use products that were initially developed and tested using fetal cell lines, such as the COVID-19 vaccines, but were willing to use products, such as acetaminophen and ibuprofen, that were developed before fetal cell lines existed and were only tested using those lines at a later point. Others indicated that they were unaware of the claimed connection between fetal cell lines and the listed medications and vaccinations and stated that they would either stop taking those products if the assertions in the supplemental form turned out to be true or would discuss the issue with religious leaders and explore their [*6]own consciences before reaching any conclusions. Meanwhile, some advised that products related in some way to fetal stem cells could be used if they were required as "a last resort" or were "necessary to survive," while still others noted that their religious beliefs had changed or strengthened over time and that they would not now use products connected to fetal cell lines that they had taken earlier in their lives. UCS rejected the applications offering these explanations because, in its view, petitioners' prior or potential future use of some medical products connected to fetal cell lines, but not the COVID-19 vaccine, demonstrated that their behavior was "inconsistent with [their] stated religious beliefs."
To reiterate, a belief "need not be acceptable, logical, consistent, or comprehensible to others" to be sincerely held (Thomas v Review Bd. of Indiana Empl. Sec. Div., 450 US at 714). There is nothing obviously inconsistent in the belief that the use of medical products that were developed and/or tested using fetal cell lines is generally impermissible but that their use could nevertheless be morally justified in certain circumstances. Indeed, even established faith groups that have found the use of vaccines to be permissible despite their relationship to fetal cell lines have acknowledged that other moral considerations were at play (see e.g. Joe Carter & Justin Smith, The Ethics and Religious Liberty Commission of the Southern Baptist Convention, Explainer: Vaccines and aborted human fetal tissue [Feb. 5, 2015], available at https://erlc.com/
resource-library/articles/explainer-vaccines-and-aborted-human-fetal-tissue/ [last accessed Jan. 17, 2024]). It appears that the petitioners who stated objections to the use of fetal cell lines in the development of COVID-19 vaccines "drew a line" in such morally murky cases and, while those lines may not have been "articulated with the clarity and precision that a more sophisticated" religious thinker might accomplish, such did not demonstrate an inconsistency that would warrant disregarding the claimed religious belief as less than genuinely held (Thomas v Review Bd. of Indiana Empl. Sec. Div., 450 US at 715; see Keene v City & County of San Francisco, 2023 WL 3451687, at *2, 2023 US App LEXIS 11807, at *5; Moussazadeh v Texas Dept. of Crim. Justice, 703 F3d 781, 791 [5th Cir 2012]; Reed v Faulkner, 842 F2d 960, 963 [7th Cir 1988]). I accordingly agree with Supreme Court that UCS failed to properly assess the applications of those 19 petitioners and would affirm so that UCS may conduct the correct inquiry (see Keene v City & County of San Francisco, 2023 WL 3451687, at *2, 2023 US App LEXIS 11807, at *5).
ORDERED that the amended judgment is modified, on the law, without costs, by reversing so much thereof as partially granted the petition; petition dismissed in its entirety; and, as so modified, affirmed.

Footnotes

Footnote 1: Having so concluded, we need not address respondents' further contention that the challenge of one of these petitioners is also barred by the statute of limitations.

Footnote 2: It should be noted that UCS admittedly required "the vast majority of applicants for religious exemption . . . to submit the [s]upplemental [f]orm," raising the question of exactly what standard was being applied in determining that most of the applications "did not provide sufficient information" to assess the nature and sincerity of the applicants' beliefs.