3/1/21

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH, et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF LOS ANGELES COUNTY, <br><br> Respondent, <br><br> CALIFORNIA RESTAURANT ASSOCIATION, INC., et al., <br><br> Real Parties in Interest. | B309416 <br><br> (Los Angeles County Super. Ct. Nos. 20STCP03881, 20STCV45134) |

ORIGINAL PROCEEDINGS; petition for writ of mandate. James C. Chalfant, Judge. Petition granted.

Rodrigo A. Castro-Silva, Acting County Counsel, Judy Whitehurst and Edward Morrissey, Assistant County Counsels, Natasha Mosley, Deputy County Counsel; Miller Barondess, Amnon Z. Siegel, Jason H. Tokoro, Minh-Van T. Do; Greines Martin, Stein & Richland, Timothy T. Coates and Marc J. Poster for Petitioners.

Brown George Ross O'Brien Annaguey & Ellis, Dennis S. Ellis, Eric M. George, Katherine F. Murray, Ryan Q. Keech, Lori

Sambol Brody, Carl Alan Roth, Noah S. Helpern, Richard A. Schwartz for Real Party in Interest California Restaurant Association.

Geragos & Geragos, Mark J. Geragos and Mathew Hoesly for Real Party in Interest Mark's Engine Company No. 28 Restaurant, LLC.

Horvitz & Levy, Bradley S. Pauley and Eric S. Boorstin for The Bicycle Casino, LP, California Commerce Club, Inc., Crystal Casino, Hawaiian Gardens Casino, and Hollywood Park Casino Company, Inc., as Amicus Curiae on behalf of Real Parties in Interest.

Littler Mendelson, Bruce J. Sarchet and Michael J. Lotito for Restaurant Law Center as Amicus Curiae on behalf of Real Parties in Interest.

Gordon Rees Scully Mansukhani, Marie Trimble Holvick for Golden Gate Restaurant Association as Amicus Curiae on behalf of Real Parties in Interest.

Burke, Williams & Sorensen, Joseph M. Montes and Brian S. Ginter for City of Santa Clarita as Amicus Curiae on behalf of Real Parties in Interest.

# INTRODUCTION

At a time when infection rates were surging, and Southern California's intensive care units were about to be overwhelmed by COVID-19 patients, Los Angeles County's Department of Public Health issued an emergency order temporarily prohibiting outdoor restaurant dining. Indoor restaurant dining had already been banned. Although the Department and its leadership (collectively, the County) had no study specifically demonstrating that outdoor restaurant dining contributes to the spread of the disease, they had a rational basis to believe it does.

For example, it is undisputed that the disease spreads through airborne transmission from an infected person (who may be asymptomatic) to an uninfected member of the community, if the latter receives a sufficient dose to overcome his or her defenses. The risk of transmission thus increases when people from different households gather in close proximity for extended periods without masks or other face coverings. The risk also increases with unmasked talking and laughter. These conditions are often all present when people dine together in restaurants, whether indoors or out.

According to the County's Chief Medical Officer and Director of Disease Control, the wide consensus in the public health field is that pandemic risk reduction does not require definitive proof that a particular activity or economic sector is "the" cause of an increase in cases. Rather, best practices dictate that public health departments take steps to mitigate identified risks, particularly as infection rates and hospitalizations surge.

In these consolidated cases, the trial court enjoined the County's order temporarily banning outdoor restaurant dining until the County performed a risk-benefit analysis acceptable to the court. We issued a stay and an order to show cause why the lower court's order should not be set aside. We now hold that courts should be extremely deferential to public health authorities, particularly during a pandemic, and particularly

where, as here, the public health authorities have demonstrated a rational basis for their actions. Wisdom and precedent dictate that elected officials and their expert public health officers, rather than the judiciary, generally should decide how best to respond to health emergencies in cases not involving core constitutional freedoms. Courts should intervene only when the health officials' actions are arbitrary, capricious, or otherwise lack a rational basis, or violate core constitutional rights, which demonstrably is not the case here.

Thankfully, during the pendency of this petition, infection rates declined and ICU availability increased, causing the Governor to rescind a similar prohibition on outdoor dining at restaurants, and the County to lift its prohibition as well. While we hope we do not see another surge, we recognize that conditions may change and the County may re-impose its outdoor restaurant dining ban. Thus, the cases are not moot. Accordingly, we issue a peremptory writ of mandate directing the trial court to set aside its order granting a preliminary injunction, and to instead deny the motions seeking that relief.

This does not mean we are unsympathetic to the plight of restaurant owners and their employees, or to those in so many other sectors who have had their livelihoods taken away and personal finances decimated by the pandemic. Far from it. Both the disease itself and its economic consequences have harmed people and communities unequally, sometimes devastatingly so. But whether, when, and how a risk-benefit calculus should be performed, and whether existing orders should be altered to mitigate their costs, is a matter for state and local officials to decide. The Los Angeles County Board of Supervisors considered the restaurant industry's objections to the order prohibiting outdoor dining at restaurants, but declined (by a majority vote) to rescind the order. On these facts, we will not disturb that decision.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 4, 2020, Governor Newsom declared a "State of Emergency,"[1] in response to the global outbreak of COVID-19, "a new disease, caused by a novel (or new) coronavirus that has not previously been seen in humans." (Centers for Disease Control and Prevention, Coronavirus Disease, COVID-19, Frequently Asked Questions, What is COVID-19? (Feb. 2, 2021) <https://www.cdc.gov/coronavirus/2019-ncov/faq.html> (as of February 2, 2021).). To limit the spread of COVID-19, on March 19, 2020, Governor Newsom issued a Stay-at-Home Order, requiring California residents to remain in their homes except when engaging in essential activities.

Since March 2020, the County has also issued a series of health orders to combat the spread of COVID-19. These orders have been modified in response to hospitalization and death rates, and scientists' evolved understanding of how the virus is transmitted. The County's June 1, 2020 order prohibited restaurants from providing indoor dining, but permitted them to offer outdoor dining if they followed safety protocols set forth in the order. On November 19, 2020, the County imposed further restrictions on outdoor dining, including that dining must be reduced by 50% or tables must be repositioned so that they are at least eight feet apart.

On November 22, 2020, the County announced that, effective November 25, 2020, it would temporarily prohibit both

---

1     The Emergency Services Act (ESA) empowers state and local governments to declare emergencies and coordinate efforts to provide services. (Gov. Code, §§ 8550-8669.7.) A "state of emergency" means "the existence of conditions of disaster or of extreme peril to the safety of persons and property within the state caused by conditions" including an "epidemic" and "which, by reason of their magnitude, are or are likely to be beyond the control of" any single county or city and "require the combined forces of a mutual aid region or regions[.]" (Gov. Code, § 8558.)

indoor and outdoor dining at restaurants, breweries, wineries, and bars to combat the alarming surge in COVID-19 hospitalizations and deaths (the "Order"). Under the Order, restaurants were permitted to continue take-out, delivery, and drive-through services.

In response to the Order, the California Restaurant Association, Inc. (CRA) and Mark's Engine Company No. 28 Restaurant LLC (Mark's) (collectively, the "Restaurateurs"), filed separate suits against the County in respondent Los Angeles County Superior Court. CRA alleged the County "shut down outdoor dining without relying on or making available to the public any competent scientific, medical, or public health evidence stating that outdoor dining poses a substantial risk of unacceptably increasing the transmission of COVID-19." It brought claims for (1) writ of traditional mandate; (2) writ of administrative mandate; (3) declaratory and injunctive relief; and (4) violation of due process and equal protection. Similarly, Mark's alleged the Order "is an abuse of Defendants' purported 'emergency powers' and is neither grounded in science, evidence nor logic, and thus should be deemed and adjudicated . . . to be unenforceable as a matter of law." It brought claims for (1) declaratory judgment; and (2) infringement of its right to liberty (Cal. Const. art. I, § 1).[2]

On November 24, 2020, the trial court denied CRA's ex parte application to stay the Order for failure to present sufficient evidence to make a prima facie case. It permitted CRA

2     Neither CRA nor Mark's, however, argues in this writ proceeding that the Order violates its right to liberty under the California Constitution or the equal protection clause of the Fourteenth Amendment, except for Mark's cursory statement that the Order "had a disparate impact on [Mark's] and has unfairly targeted the restaurant industry, despite the total lack of scientific evidence . . . ." We therefore deem these arguments abandoned. (*Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1171, fn. 12.)

to renew its application, however, as one for a temporary restraining order (TRO) and an order to show cause re: preliminary injunction (OSC) if it "presented evidence that the restrictions are unsupported and of irreparable harm." On December 1, 2020, the court also denied Mark's separate ex parte application, but permitted it to file a new ex parte application for a TRO and OSC. The trial court later denied CRA's and Mark's ex parte applications for a TRO, but issued an OSC and set the consolidated actions for hearing.

While this action was pending in the trial court, Governor Newsom issued a Regional Order, which took effect on December 5, 2020. The Regional Order, among other things, prohibited indoor and outdoor dining at restaurants in the Southern California region in the event available ICU beds in the region fell below 15% of capacity. The Regional Order was to remain in effect for at least three weeks and, after that period, would be lifted if the region's ICU availability projection for four weeks equaled or exceeded 15% of capacity.

On December 8, 2020, the trial court held a hearing on the OSC. On December 15, 2020, the trial court entered an order enjoining the County from enforcing or enacting any County ban on outdoor dining after December 16, 2020, unless and until its public health officers "conduct[ ] an appropriate risk-benefit analysis and articulate it for the public to see."

The County petitioned this court for a writ of mandate directing respondent court to immediately stay the preliminary injunction, and issue a peremptory writ commanding respondent court to set aside the injunction. We stayed the preliminary injunction order and issued an order to show cause on December 18, 2020. The Restaurateurs filed a return, and the County filed a reply.[3] We also granted the applications of the City of Santa

---

3    CRA requests we take judicial notice of nine documents. Exhibits 1-5 are printouts from the Centers for Disease Control and the County of Los Angeles Public Health websites purporting

7

Clarita, Golden Gate Restaurant Association, Bicycle Casino, LP, et al., and Restaurant Law Center to file amicus briefs in support of the Restaurateurs.

While this writ petition was pending, on January 25, 2021, the Governor lifted the Regional Order based on the latest projections of improved regional ICU availability. The County also announced on January 25, 2021 that it would permit outdoor dining at restaurants beginning January 29, 2021, but with significant restrictions (including minimum specified distances between tables, requiring servers to wear face coverings at all times and patrons to do so unless eating or drinking, and a new requirement that diners may only be seated at a table with members of their own household).

---

to demonstrate that federal and Los Angeles County health authorities conduct risk-benefit analyses in connection with determinations about public health policy. These documents were not presented to the trial court, and we decline to judicially notice them. (See *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325-326 ["An appellate court may properly decline to take judicial notice under Evidence Code sections 452 and 459 of a matter which should have been presented to the trial court for its consideration in the first instance. [Citations.]"].) We also deny CRA's request to judicially notice Exhibits 8 and 9, minute orders dated December 16, 2020 and December 17, 2020 in *Midway Ventures, LLC v. County of San Diego, et al.*, Case No. 37-2020-00038194-CU-CR-CTL. We do not consider unpublished trial court orders in other cases as authority and, in any event, the Court of Appeal reversed the trial court on the ground it "erred by entering an overbroad injunction that was unsupported by the law[.]" (*Midway Ventures LLC v. County of San Diego*(2021) 60 Cal.App.5th 58.) We grant CRA's request to judicially notice Exhibits 6 and 7, County orders dated December 11, 2020 and December 27, 2020. (Evid. Code, § 452, subd. (h).)

## DISCUSSION

### A. Standard of Review

We generally review the grant of a preliminary injunction for abuse of discretion. (*Sahlolbei v. Providence Healthcare, Inc.* (2003) 112 Cal.App.4th 1137, 1145.) In exercising its discretion, the court must consider "two interrelated factors: the likelihood the moving party ultimately will prevail on the merits, and the relative interim harm to the parties from the issuance or nonissuance of the injunction. [Citation.]" (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 999.) "A trial court may not grant a preliminary injunction, regardless of the balance of interim harm, unless there is some possibility that the plaintiff will ultimately prevail on the merits of the claim. [Citation.] 'Where there is . . . no likelihood that the plaintiff will prevail, an injunction favoring the plaintiff serves no valid purpose and can only *cause* needless harm.' [Citation.]" (*Aiuto v. City & County of San Francisco* (2011) 201 Cal.App.4th 1347, 1361.) Where "the determination on the likelihood of a party's success rests on an issue of pure law not presenting factual issues to be resolved at trial, we review the determination de novo. [Citation.]" (*14859 Moorpark Homeowner's Assn. v. VRT Corp.* (1998) 63 Cal.App.4th 1396, 1403.) For the reasons discussed below, we conclude the trial court failed to apply the proper deferential standard for evaluating state and local agencies' responses to public health emergencies. Under the correct standard, there is no likelihood the Restaurateurs will prevail on the merits of their claims. The trial court therefore abused its discretion by issuing a preliminary injunction.

### B. This Action is Not Moot

As stated above, while this writ was pending, the County lifted its prohibition on outdoor dining based on the latest data

9

demonstrating a decline in daily case and hospitalization rates. This matter is not moot, however. (See *Roman Catholic Diocese v. Cuomo* (2020) 592 U.S __, __ [141 S.Ct. 63, 68, 208 L.Ed.2d 206, 210] (*per curiam*) (*Roman Catholic Diocese*) [holding the applications to enjoin an order restricting attendance at religious services were not moot despite those restrictions being lifted during the pendency of the action because "the applicants remain under a constant threat" that those restrictions may be reinstated as the COVID-19 pandemic evolves].) The County has made it clear that it may re-impose its prohibition on outdoor dining if the region faces another surge. This matter therefore fits squarely within an exception to mootness: "'(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.' [Citation.]" (*FEC v. Wis. Right to Life, Inc.* (2007) 551 U.S. 449, 462 [127 S.Ct. 2652, 168 L.Ed.2d 329]; see also *Amgen Inc. v. California Correctional Health Care Services* (2020) 47 Cal.App.5th 716, 728 [an appellate court retains "'discretion to decide a moot issue if the case presents an issue of "'substantial and continuing public interest'" and is capable of repetition yet evades review.' [Citation.]"].)

## C. The Order is Not a Plain, Palpable Invasion of Rights Secured by the Fundamental Law and is Rationally Related to Limiting the Spread of COVID-19

### a. *Jacobson* and Its Progeny

More than 100 years ago, the United States Supreme Court established the extremely deferential standard of review applicable to emergency exercises of governmental authority during a public health emergency. In 1905, the Supreme Court

10

upheld a mandatory vaccination law against a substantive due process challenge. (*Jacobson v. Massachusetts* (1905) 197 U.S. 11, 39 [25 S.Ct. 358, 49 L.Ed. 643] (*Jacobson*).) It stated: "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." (*Id*. at p. 27.) Thus, government action that "purport[s] to . . . protect the public health" in such an emergency will be upheld, unless it "has no real or substantial relation" to the object of public health or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law[.]" (*Id*. at p. 31.)

*Jacobson* predates the tiers of scrutiny used in modern constitutional law. Some (including the Restaurateurs) have questioned its continued vitality and applicability to state and local responses to the COVID-19 pandemic. (See *Delaney v. Baker* (D.Mass. 2021) __ F.Supp.3d __, 2021 U.S.Dist. LEXIS 1567 [collecting some criticism of *Jacobson*, particularly as applied to First Amendment challenges to pandemic restrictions].)

*Jacobson* was cited both positively and negatively in both concurrences and dissents in the recent series of United States Supreme Court cases adjudicating challenges to emergency exercises of state authority in the current pandemic based on the Free Exercise Clause of the First Amendment. The Supreme Court had ample opportunity to overrule *Jacobson,* but did not. (See, e.g., *S. Bay United Pentecostal Church v. Newsom* (2020) 592 U.S. __ [140 S.Ct. 1613, 207 L.Ed.2d 154] (*per curiam*) (*South Bay I*); *Calvary Chapel Dayton Valley v. Sisolak* (2020) 140 S.Ct. 2603 [207 L.Ed.2d 1129] (mem.) (*Calvary Chapel Dayton Valley*); *Roman Catholic Diocese, supra,* 141 S.Ct. 63 (*per curiam*); *S. Bay United Pentecostal Church v. Newsom* (2021) 592 U.S. __ [141 S.Ct. 716] (mem.) (*South Bay II*).)

In the first two cases, *South Bay I* and *Calvary Chapel Dayton Valley*, the Supreme Court declined to enjoin pandemic restrictions despite Free Exercise Clause challenges. In *Roman*

11

*Catholic Diocese* and *South Bay II*, however, it enjoined health orders, concluding the orders unlawfully discriminated against religious groups. The different outcomes may be attributed to factual differences, and/or to the fact that Justice Amy Coney Barrett joined the court. In any event, the dissenters in *South Bay I* and *Calvary Chapel Dayton Valley* were in the majority in the later cases.

Under precepts of stare decisis, it is our role to harmonize *Jacobson* and these recent cases. We do so without difficulty. *Jacobson* admonished that "no rule prescribed by a state, nor any regulation adopted by a local governmental agency acting under the sanction of state legislation" to protect public health may "contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument." (*Jacobson, supra,* 197 U.S. at p. 25.) *Roman Catholic Diocese* and *South Bay II* enjoined application of public health orders that the majorities concluded violated the Free Exercise Clause because public officials failed to demonstrate that the distinctions drawn between houses of worship and secular businesses were based on scientific or medical expertise. This is fully consistent with *Jacobson*. As Chief Justice Roberts wrote in his concurrence in *South Bay II*, in a clear reference to his earlier reliance on *Jacobson* in *South Bay I*, "I adhere to the view that the 'Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States.' But the Constitution also entrusts the protection of the people's rights to the Judiciary . . . . Deference, though broad, has its limits." (*South Bay II, supra,* 141 S.Ct. at p. 717 (conc. opn. of Roberts, C.J.); see also Thaler, *The Next Surges Are Here: What Can American Governments Lawfully Do In Response to the Ongoing COVID-19 Pandemic?* (2021) 42 Mitchell Hamline L.J. Pub. Pol'y & Prac. 165.)

In any event, the substantive due process claims advanced by the Restaurateurs are analyzed in essentially the same way

under *Jacobson* or employing modern rational basis review.[4] (See *Roman Catholic Diocese, supra*, 141 S.Ct. at pp. 69-71 (conc. opn. of Gorsuch, J.) [equating *Jacobson* and rational basis review].)

We agree with the following summary of the current state of the law as laid out by Justice Kavanaugh in his dissenting opinion in *Calvary Chapel Dayton Valley*, *supra,* 140 S.Ct. at pp. 2614-2615, and believe a majority of the United States Supreme Court would, too. It reconciles *Jacobson* with the Supreme Court's most recent cases and indicates the Restaurateurs' claims in this case should be resolved by extending great deference to the State and County, per *Jacobson*:

> "[C]ourts should be very deferential to the States' line-drawing in opening businesses and allowing certain activities during the pandemic. For example, courts should be extremely deferential to the States when considering a substantive due process claim by a secular business that is being treated worse than another business. Cf. *Jacobson v. Massachusetts*, 197 U.S. 11, 25-28, 25 S. Ct. 358, 49 L.Ed. 643 (1905). Under the Constitution, state and local governments, not the federal courts, have the primary responsibility for addressing COVID-19 matters such as quarantine requirements, testing plans, mask mandates, phased reopenings, school closures, sports rules, adjustment of voting and election procedures, state court and correctional institution practices, and the like.

> "But COVID 19 is not a blank check for a State to discriminate against religious people, religious

---

4      We note some courts appear to interpret the *Jacobson* test as more deferential than the rational basis standard. (See, e.g., *Calvary Chapel v. Mills* (D.Me. 2020) 459 F.Supp.3d 273, 284 ["while such an epidemic is ongoing, the 'traditional tiers of constitutional scrutiny do not apply.' [Citations.]"].)

13

organizations and religious services. There are certain constitutional red lines that a State may not cross even in a crisis. Those red lines include racial discrimination, religious discrimination and content-based suppression of speech."

For purposes of substantive due process claims, the rational basis test is "the law must not be unreasonable, arbitrary or capricious but must have a real and substantial relation to the object sought to be obtained. [Citations.]" (*Gray v. Whitmore* (1971) 17 Cal.App.3d 1, 21.) "[N]o valid objection to the constitutionality of a statute under the due process clause may be interposed 'if it is reasonably related to promoting the public health, safety, comfort, and welfare, and if the means adopted to accomplish that promotion are reasonably appropriate to the purpose.' [Citations.]" (*People v. Aguiar* (1968) 257 Cal.App.2d 597, 602.)

Similarly, "[w]here judicial review of administrative action by an agency acting in its legislative capacity is sought, that review begins and ends with a determination as to whether the agency's action has been ""arbitrary, capricious, or entirely lacking in evidentiary support . . . ."" [Citations.]" (*Davies v. Contractors' State License Bd.* (1978) 79 Cal.App.3d 940, 946; see also *Ursack, Inc. v. Sierra Interagency Black Bear Group* (9th Cir. 2011) 639 F.3d 949, 958 [noting "rational basis" and "arbitrary and capricious" standards of review are "identical"].) "A court reviewing a quasi-legislative act cannot reweigh the evidence or substitute its own judgment for that of the agency. [Citation.]" (*Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1406.)

14

### b. Analysis

Here, the Restaurateurs contend the County exceeded its "emergency powers" under the Health and Safety Code[5] by implementing the Order without conducting a risk-benefit analysis. They also contend the Order violates their substantive due process rights under the Fifth and Fourteenth Amendments. Although the Restaurateurs did not specifically label their claims as violations of their "substantive" due process rights, the trial court so characterized them because the claims target alleged arbitrary government action.

As discussed above, the Restaurateurs' excess of power and constitutional arguments both call for the same analysis: the core issue is whether the County's temporary suspension of outdoor restaurant dining is rationally related to a legitimate state interest, i.e., limiting the spread of COVID-19. (See *Roman Catholic Diocese, supra*, 141 S.Ct. at p. 67 ["Stemming the spread of COVID-19 is unquestionably a compelling interest . . . ."].)[6]

---

5　　Health and Safety Code section 101040, subdivision (a) states, in relevant part: "The local health officer may take any preventive measure that may be necessary to protect and preserve the public health from any public health hazard during any . . . 'state of emergency,' or 'local emergency,' . . . within his or her jurisdiction." Health and Safety Code section 120175 states: "Each health officer knowing or having reason to believe that any case of the diseases made reportable by regulation of the department, or any other contagious, infectious or communicable disease exists, or has recently existed, within the territory under his or her jurisdiction, shall take measures as may be necessary to prevent the spread of the disease or occurrence of additional cases."

6　　The Restaurateurs also argue the Order infringes their fundamental right to pursue a profession. But "[t]he right to pursue one's chosen profession is not a fundamental right for the

15

In support of their requests for a preliminary injunction, the Restaurateurs offered several expert declarations regarding the purported lack of evidence to support the Order and the economic harm the Order would cause restaurant owners and employees. For example, Jeff Barke, M.D., a primary care physician, opined the Order does not comport with epidemiological science and lacks a rational and legitimate medical basis. Similarly, Hubert A. Allen Jr., a biostatistician, declared no evidence or scientific studies support the conclusion that operating outdoor dining in Los Angeles County poses an unreasonable risk to public health.

The Restaurateurs also offered the declaration of Jayanta Bhattacharya, M.D., a Professor of Medicine and infectious disease specialist at Stanford University. In Dr. Bhattacharya's opinion, restaurants could safely permit outdoor dining by following the Centers for Disease Control guidelines (i.e., social distancing and mask wearing by servers and by patrons when not eating). He explained the County provided "no indication that it has estimated or otherwise taken into account any of the economic, social, and public health costs of restricting outdoor dining." He also opined, without reference to any supporting evidence, that "[b]asic standards of public health policy design require a comparison of health costs and benefits of a policy to justify it from a scientific and ethical point of view." He further stated, "[a] scientifically justified policy must explicitly account for these costs – including an explicitly articulated economic analysis – in setting, imposing, and removing criteria for business restrictions such as the blanket prohibition on outdoor dining."

In response, the County submitted the declaration of Muntu Davis, M.D., the County's Health Officer and medical

purpose of invoking the strict scrutiny test. [Citations.]" (*Cunningham v. Superior Court* (1986) 177 Cal.App.3d 336, 348.)

expert regarding public health matters. He declared: "The County recognizes that it has asked businesses in the County and its more than 10 million residents to make significant adjustments to fight this pandemic. Yet, in the considered opinions of myself and that of DPH [the County Department of Health] and its top communicable disease experts, these temporary adjustments and modifications are necessary to combat the ongoing surge in COVID-19 cases and hospitalizations, and the resulting strain on the County's health care system." He further stated: "Allowing COVID-19 to proliferate unchecked across the County, without taking affirmative measures to reduce transmission would be unacceptable, unethical, and bad public policy. The societal costs of allowing large numbers of preventable deaths in a quest for 'herd immunity' would far outweigh any economic or other benefits. That is why the overwhelming majority view has rejected and criticized Dr. Bhattacharya's suggested approach." Dr. Davis concluded: "Based on the data, I determined that the risks and harms of uncontrolled community spread, strain on the health care system, and excess preventable deaths outweighed the social and economic harm of a temporary suspension on in-person restaurant dining."

The County also offered the declaration of Jeffrey Gunzenhauser, M.D., the County's Chief Medical Officer and the Director of the Disease Control Bureau. He initially noted that "[b]ecause the virus that causes COVID-19 is novel, much remains uncertain." He explained, however, there is a consensus among epidemiologists that the most common mode of transmission of COVID-19 is from person-to-person respiratory droplets that are expelled when a person coughs, sneezes, or projects his or her voice. "There is also evidence that COVID-19 may be spread through aerosols that are expelled when a person speaks." There is no scientifically agreed-upon safe distance, but it is widely accepted that standing or sitting near an infectious person is riskier than being farther away.

Moreover, it is "widely accepted that an infected person is capable of transmitting COVID-19 before they develop symptoms and if they ever develop symptoms at all. Asymptomatic and pre-symptomatic transmission make COVID-19 particularly difficult to contain. Individuals without symptoms are generally unaware that they are infected and are thus less likely to isolate or take other steps to avoid transmitting the virus."

Dr. Gunzenhauser further stated, "[t]he risk of transmission further increases when individuals are in close proximity for an extended period of time" and when "individuals are not wearing face coverings." "Being in close proximity to an unmasked infected person for a prolonged period of time presents an especially high risk of receiving a viral dose sufficient to cause COVID-19 infection."

Marianne Gaushe-Hill, Medical Director for the County's Department of Emergency Medical Services Agency, detailed the recent surge in COVID-19 hospitalizations and the then imminent overwhelming of the County's healthcare system. Specifically, the "County's ICU bed availability in the month of November [ ] decreased to less than 5% of total capacity." The County notes in its Reply brief, filed January 19, 2021, that available ICU capacity in the Southern California region "has been down to 0% since early December 2020."

After reviewing the evidence, the trial court found the "County ha[d] shown that the greatly decreased capacity of hospitals and ICUs [were] burdening the healthcare system and action w[as] necessary." It concluded, however, that what it called "the County's syllogism" – "(a) COVID[-19] is spread by expelled droplets that transmit the virus to others in proximity, (b) people eating outdoors in restaurant are in proximity to others and they are not wearing masks, (c) therefore outdoor dining has a risk of spreading COVID[-19] – only weakly supports closure of outdoor restaurant dining because it ignores the outdoor nature of the activity which the CDC says carries only a moderate risk (and

18

less with mitigations.)" After conceding it could not "weigh evidence in deciding whether the restriction ha[d] a rational basis, and [that] the Department [had] generalized evidence of a COVID[-19] risk in outdoor dining," the trial court nevertheless held the County acted arbitrarily, because it failed "to perform the required risk-benefit analysis."

Thus, despite acknowledging Supreme Court precedent requiring it to show great deference to the County in these circumstances, and the "syllogism" demonstrating a rational basis for the challenged order, the trial court took it upon itself to adopt Dr. Bhattacharya's unsupported opinion and mandate a "risk-benefit analysis" before the County could enforce its order. The trial court stated it could not "dictate what the [County] must do as part of the risk-benefit analysis."

Mandating a nebulous risk-benefit requirement is inconsistent with the court's appropriate role. As discussed above, our "review begins and ends with a determination . . . whether the agency's action has been ""arbitrary, capricious, or entirely lacking in evidentiary support . . . ."" [Citations.]" (*Davies v. Contractors' State License Bd.*, *supra,* 79 Cal.App.3d at p. 946.) The County's imposition of the Order is none of those things.

Of course, more particularized studies of the spread of COVID-19 while dining at outdoor restaurants would be valuable. But undertaking those studies takes time and resources that may not be available when swift government action must be taken in response to surging infection, hospitalization, and death rates during a once in a century pandemic.[7] As of

---

7    Information about outdoor COVID-19 transmission is not completely absent, however. Relying on an incident in which a 27 year-old man contracted COVID-19 after having a conversation with another individual outdoors who had recently returned from Wuhan, Dr. Davis noted that "[w]hile the risk of transmission is lower outdoors, it is still present." Dr. Davis also cited a study on

this writing, government sources indicate more than 500,000 Americans have died with COVID-19. As has been widely reported, that grim figure exceeds the number of U.S. soldiers killed in combat in the Vietnam War and both World Wars combined. Approximately 50,000 of those deaths reportedly occurred in the State of California, with about 20,000 reported in Los Angeles County alone. (United States COVID-19 Cases and Deaths by State (Feb. 25, 2021) (covid.cdc.gov/covid-data-tracker/#cases_totaldeaths); LA County Daily COVID-19 Data (Feb. 25, 2021) (publichealth.lacounty.gov/media/coronavirus/data/index.htm).)[8]

When the Order went into effect, Los Angeles was experiencing a surge of infections. Against this backdrop, the County was forced to take immediate action. As detailed in Dr. Davis's declaration, the County recognized the preventative measures required to slow the spread of COVID-19, including temporarily restricting in-person dining, have an emotional and economic impact on businesses, families, and individuals, but ultimately determined the restriction on outdoor dining was necessary because "dining with others creates a circumstance where non-household members are gathering in close proximity to each other without any COVID-19 infection control protections and typically for more than 15 minutes." This scenario presents "significant risks of transmission from persons who are asymptomatic or pre-symptomatic" and "from a disease control standpoint" restricting in-person dining "is necessary to mitigate

_____

the effectiveness of physical distancing in controlling the spread of COVID-19, and stated, "outdoor, well-ventilated spaces, such as an open patio restaurant, where unmasked persons have prolonged contact, present a moderate risk of transmission. Being outdoors reduces risk but does not eliminate it."

8      On our own motion, we take judicial notice of the CDC and the County of Los Angeles Public Health websites tracking the numbers of COVID-19 deaths. (Evid. Code, § 452, subd. (h).)

the risks presented by persons gathering together without masks." In making this determination, Dr. Davis relied, in part, on "a number of studies showing the role of masks in limiting the spread of COVID-19, and that situations where unmasked individuals from different households spend extended periods of time in close proximity to one another present a higher risk of transmission than settings where one or more of these factors is absent."

We decline the Restaurateurs' invitation to second-guess public health officials' actions in an "'area[ ] fraught with medical and scientific uncertainties.'" (*South Bay I, supra,* 140 S.Ct. at p. 1613 (conc. opn. of Roberts, C.J.).) Because the Restaurateurs failed to satisfy their burden of demonstrating the Order is arbitrary, capricious, or without rational basis, we conclude they cannot ultimately succeed on the merits of their claims. Thus, they were not entitled to injunctive relief. (*Aiuto v. City & County of San Francisco, supra*, 201 Cal.App.4th at p. 1361 ["A trial court may not grant a preliminary injunction, regardless of the balance of interim harm, unless there is some possibility that the plaintiff will ultimately prevail on the merits of the claim. [Citation.]"].)

## D.   Mark's Freedom of Assembly Argument

Mark's joins in the arguments of CRA, but also separately contends the Order violates its (or its patrons') First Amendment right to freedom of assembly. Mark's seemingly forfeited this argument by failing to raise it in the trial court. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 411-412 ["As a general rule, a party is precluded from urging on appeal any point not raised in the trial court. [Citation.]"].) In its complaint, Mark's also failed to allege the Order violated its (or its patrons') First Amendment right to freedom to assembly. The closest it came to raising the issue below is one sentence in its trial court brief where it contends it is

21

entitled to preliminary injunctive relief because the Order "is irrational, arbitrary and capricious," and "has caused irreparable harm, economic damages, loss of civil liberties, and massive unemployment" and "represents a plain and palpable invasion of clearly protected rights, i.e., Freedom of Association, Right to Labor, Right to Equal Protection of the Law." But perhaps recognizing its complaint is devoid of any First Amendment claim, Mark's did not argue the Order violated its First Amendment right to freedom of assembly (i.e., a fundamental right) and therefore should be subject to intermediate or strict scrutiny. Because Mark's did not raise a freedom of association claim in its complaint, did not request leave to amend to add such a claim, and made no reasoned argument about such a claim, the trial court did not consider it or address it in its 52-page decision.

In any event, we reject Mark's argument on the merits. Initially, we note Mark's fails to address whether a restaurant – as opposed to its patrons – has a right to freedom of assembly. Even assuming, however, that Mark's has such a right, or has standing to bring a First Amendment challenge on behalf of its patrons or employees, its contention fails. The First Amendment guarantees that "Congress shall make no law . . . abridging . . . the right of the people to peaceably assemble." (U.S. Const. 1st Amend.) Constitutional rights, however, "may at times, under the pressure of great dangers" be restricted "as the safety of the general public may demand." (*Jacobson, supra*, 197 U.S. at p. 29.) Specifically, states may impose reasonable restrictions on the time, place, and manner of protected speech and assembly provided the restrictions "'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' [Citations.]" (*Ward v. Rock Against Racism* (1989) 491 U.S. 781,

791 [109 S.Ct. 2746, 105 L.Ed. 661] (*Ward*).) The Order meets this standard.

First, the Order does not regulate assembly based on the expressive content of the assembly. Instead, it prohibits all outdoor dining at restaurants, breweries, wineries, and bars irrespective of the purpose of the gathering or type of speech the patrons may wish to express.

Second, as stated above, it is undisputed limiting the spread of COVID-19 is a legitimate and substantial government interest. Banning outdoor dining, where people from different households gather in close proximity for extended periods without masks, is narrowly tailored to limiting the spread of COVID-19. (See *Ward*, *supra*, 491 U.S. at p. 800 ["So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."].)

Third, the Order leaves open alternative channels for assembling, i.e., videoconference or in-person socially distant gatherings with face coverings. (See, e.g., *Amato v. Elicker* (D. Conn. 2020) 460 F.Supp.3d 202, 222 ["[T]he limitation on the size of in-person social and recreational gatherings leaves open alternative channels of expression: . . . residents are free to communicate and express themselves in any means other than a large, in-person gathering. They may assemble in small groups and may communicate with any number of people over the phone or over videoconference."].) We therefore conclude the Order does not violate Mark's purported First Amendment right to freedom of assembly or that of its patrons.

23

## DISPOSITION

Let a peremptory writ of mandate issue directing respondent court to vacate its December 15, 2020 order enjoining the County from enforcing its orders to the extent they prohibit outdoor dining until after conducting an appropriate risk-benefit analysis, and enter a new order denying the Restaurateurs' request for a preliminary injunction. The County is awarded its costs in this original proceeding.

CURREY, J.

- WE CONCUR:

- MANELLA, P. J.

- WILLHITE, P. J.

24