Roman Catholic Diocese of Albany v Vullo (2024 NY Slip Op 02764)

Roman Catholic Diocese of Albany v Vullo

2024 NY Slip Op 02764 [42 NY3d 213]

May 21, 2024

Wilson, Ch. J., J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, October 16, 2024

[*1]

Roman Catholic Diocese of Albany et al., Appellants,
v
Maria T. Vullo et al., Respondents, et al., Defendants. (And Another Action.)

Argued April 16, 2024; decided May 21, 2024

Roman Catholic Diocese of Albany v Vullo, 206 AD3d 1074, affirmed.

{**42 NY3d at 217} OPINION OF THE COURT

Chief Judge Wilson.

Plaintiffs, the Roman Catholic Diocese of Albany and a variety of entities ranging from churches to religiously affiliated organizations to a single individual, provide medical insurance plans to their employees. They have challenged a regulation promulgated by the Department of Financial Services as violative of the First Amendment of the United States Constitution. The challenged regulation requires New York employer health insurance policies that provide hospital, surgical, or medical expense coverage to include coverage for medically necessary abortion services (see 11 NYCRR 52.16 [o] [1]). Their challenge is to the regulation's exemption for "religious employers," which is defined by four factors (see 11 NYCRR 52.2 [y]). Plaintiffs' claim, in essence, is that the exemption is too narrow, such that the First Amendment rights of certain types of religiously affiliated employers are violated because they do not meet the terms of the exemption.
This litigation began in 2016, raising a federal free exercise claim that was then legally indistinguishable from Catholic Charities of Diocese of Albany v Serio (7 NY3d 510 [2006]), which concerned insurance coverage for contraception. Notably, the statutorily defined criteria to qualify as a "religious employer" litigated in Serio are identical to those challenged here (see Insurance Law § 3221 [l] [16] [E]). We resolved the federal free exercise claim in Serio by holding the insurance{**42 NY3d at 218} mandate and the accompanying "religious employer" definition and exemption were neutral and generally applicable pursuant to Employment Div., Dept. of Human Resources of Ore. v Smith (494 US 872 [1990]; see 7 NY3d at 522).[FN1] Because the arguments being raised, and the regulation being challenged in this litigation were substantially the same as in Serio, the motion court dismissed plaintiffs' complaints on the basis of stare decisis, and the Appellate Division affirmed on the same ground. We initially declined to hear plaintiffs' appeal and plaintiffs petitioned for certiorari from the Supreme Court of the United States.
While plaintiffs' certiorari petition was pending, the Supreme Court decided Fulton v Philadelphia (593 US 522 [2021]). Thereafter, the Court granted plaintiffs' petition, vacated the Appellate Division's judgment, and remanded to reconsider the case in light of Fulton.
On remand, the Appellate Division answered the question put to it by the Supreme Court: is Serio still controlling precedent in light of Fulton? Because Serio was decided pursuant to Smith, a case the Supreme Court explicitly did not overrule in Fulton, the Appellate Division held that Serio was still good law and affirmed its previous decision that neither the medically necessary abortion regulation nor the "religious employer" exemption as defined violated the Free Exercise Clause.
We agree. Under Fulton, both the regulation itself and the criteria delineating a "religious employer" for the purposes of the exemption are generally applicable and do not violate the Free Exercise Clause. Neither the existence of the exemption in the regulation nor the defined criteria allow for "individualized exemptions" that are standardless and discretionary, nor do they allow for comparable secular conduct while discriminating against religious conduct.
I.
The Department of Financial Services is authorized to regulate "the form, content and sale of accident and health insurance policies" (Insurance Law § 3217 [a]). In 1972, it promulgated a regulation stating that no health insurance policy "shall limit or exclude coverage by type of illness, accident,{**42 NY3d at 219} treatment or medical condition," outside of certain specified exceptions (11 NYCRR 52.16 [c]). In 2013, pursuant to the Federal Affordable Care Act, the Department of Financial Services developed a standard health insurance policy template—referred to as the "Model Language"—to serve as a guide for required coverages and insurers. Policies that conform to the Model Language covered "medically necessary abortions."[FN2]
In 2016, plaintiffs commenced the first of two actions against the Department of Financial Services and its former Superintendent, Maria T. Vullo (hereinafter collectively DFS), seeking [*2]declaratory and injunctive relief. Plaintiffs challenged certain portions of the Model Language under various constitutional provisions, including, as relevant here, the Free Exercise Clause of the Federal and New York State Constitutions, and the separation of powers and rulemaking provision of the New York State Constitution. Plaintiffs argued that because they provide medical insurance plans to their employees out of a moral obligation to do so, the regulation forced them to fund abortion "in violation of their religious doctrines, teachings and conscience rights." DFS moved to dismiss the complaint for failure to state a cause of action and plaintiffs opposed the motion, amended the complaint to add a cause of action pursuant to the Religious Freedom Restoration Act, and cross-moved for injunctive relief.
In 2017, while those motions were pending, DFS amended 11 NYCRR part 52 to make explicit that health insurance companies must provide coverage for "medically necessary abortions," with an exemption for insurance policies offered by "religious employer[s]" (11 NYCRR 52.16 [o] [1], [2]; 52.1 [p]). The definition of a "religious employer" is as follows:
"[A]n entity for which each of the following is true: (1) The inculcation of religious values is the purpose of the entity[;] (2) The entity primarily employs persons who share the religious tenets of the entity[;] (3) The entity serves primarily persons who share the religious tenets of the entity[;] (4) The entity is a nonprofit organization as described{**42 NY3d at 220} in section 6033(a)(2)(A)i or iii, of the Internal Revenue Code of 1986, as amended" (id. § 52.2 [y]).
Under the procedures set forth in the regulation, a "group or blanket policy that provides hospital, surgical, or medical expense coverage delivered or issued for delivery" in New York to a "religious employer" may exclude coverage for medically necessary abortions if: (1) the entity provides the insurance carrier with an "annual certification" that the entity meets the four criteria and thus qualifies as a "religious employer" as so defined; and (2) the entity requests a contract without coverage for medically necessary abortions (id. § 52.16 [o] [2] [i]). The insurance carrier must then issue a rider to each primary insured, at no additional cost to the insured or the "religious employer," that provides coverage for medically necessary abortions in place of the "religious employer," and then must provide notice of the issuance of the policy and rider to the Superintendent (id. § 52.16 [o] [2] [ii]-[iii]).
Plaintiffs, who have neither tried to invoke the "religious employer" accommodation nor expressly stated that they do not qualify for it, commenced a second action against DFS challenging the amended regulation. The second complaint asserted the same causes of action in the first amended complaint but did not include any claims under the Religious Freedom Restoration Act. The motion court joined the two actions.
DFS moved to dismiss the action, arguing, among other things, that the causes of action were essentially identical to those raised in Catholic Charities of Diocese of Albany v Serio (7 NY3d 510 [2006]) and should be dismissed on the principle of stare decisis. Plaintiffs cross-moved for summary judgment on all their causes of action and for a preliminary injunction, offering evidence of unsuccessful legislative efforts to mandate insurance coverage for abortion services in support [*3]of its separation of powers argument. The motion court converted DFS's motions to dismiss into motions for summary judgment pursuant to CPLR 3211 (c), granted the motions, and dismissed the complaints (2018 NY Slip Op 33829[U] [Sup Ct, Albany County 2018]). The court found that plaintiffs' constitutional claims were the same as those raised in Serio, which was binding precedent requiring the dismissal of the claims in the instant matter. The court rejected plaintiffs' attempts to distinguish the two cases and their remaining arguments. Plaintiffs appealed.
The Appellate Division unanimously affirmed (185 AD3d 11 [3d Dept 2020]). The Court agreed that plaintiffs' arguments{**42 NY3d at 221} were the same as those raised and rejected in Serio (id. at 16). The Court held that like Serio, the challenged regulation here was a "neutral regulation" to be "uniformly applied without regard to religious belief or practice, except for those who qualif[y] for a narrowly tailored religious exemption" (id. at 17).
Plaintiffs appealed from the Appellate Division's order on constitutional grounds (see CPLR 5601 [b] [1]) and sought leave to appeal to this Court. On the Court's own motion, we dismissed the appeal on the ground that no substantial constitutional question was directly involved and denied leave to appeal (36 NY3d 927 [2020]). Plaintiffs petitioned the Supreme Court of the United States for a writ of certiorari.
While the petition was pending, the Supreme Court decided Fulton v Philadelphia (593 US 522 [2021]). In light of that decision, the Supreme Court granted plaintiffs' petition, vacated the judgment, and remanded the action to the Appellate Division "for further consideration in light of Fulton" (Roman Catholic Diocese of Albany v Emami, 595 US &mdash, &mdash, 142 S Ct 421, 421 [2021]). Justices Thomas, Alito, and Gorsuch would have granted plenary review (id.).
On remand, the Appellate Division answered the Supreme Court's narrow question of whether Serio "remains valid and controlling precedent in the wake of Fulton" in the affirmative (206 AD3d 1074, 1074 [3d Dept 2022]).[FN3] The Court reasoned that because Fulton did not overrule Smith, upon which Serio primarily relied, Serio remains good law (id. at 1074-1075). The Court also held that nothing in Fulton "clearly conflicts with the holding of [Serio]" (id. at 1075) and that Serio had taken into account aspects of prior Supreme Court rulings emphasized in Fulton—specifically, that "a law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions or if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way" (id. [internal quotation marks and brackets omitted]).
[*4]
Additionally, the Appellate Division rejected plaintiffs' argument that Fulton supported the proposition that "a regulatory {**42 NY3d at 222}scheme cannot be generally applicable due to the presence of any exemptions" (id.). Instead, the Court reasoned that Fulton dealt with a " 'formal system of entirely discretionary exceptions' that invited the government to decide what motives for not complying with the regulatory requirement were worthy" (id., quoting Fulton, 593 US at 536). Therefore, the Court held, "Fulton does not bar the holding of [Serio] that a regulation, like the one at issue here, was neutral and generally applicable despite the presence of exemptions based upon specific criteria" (id.).
The Appellate Division rejected plaintiffs' remaining arguments "to the extent that they fall within the limited scope of the remand and are properly preserved for [the Court's] review" and affirmed the motion court's 2019 order dismissing the complaints (id. at 1076).
Plaintiffs appealed once again on constitutional grounds (see CPLR 5601 [b] [1]) and sought leave to appeal to this Court. We retained the appeal and denied leave as unnecessary (39 NY3d 1060 [2023]).
II.
The issue before us is a very narrow one. Although several Justices wrote concurring opinions in Fulton suggesting that Smith was wrongly decided and should be overruled (see Fulton, 593 US at 543 [Barrett, J., concurring]; id. at 545 [Alito, J., oncurring]; id. at 618 [Gorsuch, J., concurring]), Smith remains good law, and the question before us is whether Fulton impaired Smith in a way that undoes Serio in whole or in part. The issue before us is further limited in two other ways. First, because Fulton addresses a federal free exercise claim only, that is the only claim before us. Second, because Fulton was decided "under the rubric of general applicability" (id. at 533) and not neutrality, the question before us is limited to whether Fulton altered Supreme Court doctrine on general applicability in a way that should cause us to revisit Serio.
A.
Preliminarily, the Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment (see Cantwell v Connecticut, 310 US 296, 303 [1940]), provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates{**42 NY3d at 223} against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons" (Church of Lukumi Babalu Aye, Inc. v Hialeah, 508 US 520, 532 [1993]). Importantly, in Smith (494 US 872 [1990]) and Church of Lukumi (508 US 520 [1993]), the Supreme Court held that laws incidentally burdening religion are not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable.
In Smith, the Court synthesized a large body of its decisional law into a "valid and neutral law of general applicability" (494 US at 878-879) test but did not explicitly treat "neutrality" and "general applicability" as individual parts of a test. The thrust of the Supreme Court precedent relied on by the Smith Court holds that even devoutly held religious beliefs must give way to generally applicable laws where the government has not explicitly targeted a religion.
As the Supreme Court explained, "[t]he mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge [*5]of political responsibilities" (id. at 879 [internal quotation marks omitted]). This is true notwithstanding the "devastating effects" a neutral and generally applicable law may have on religious practices or communities (Lyng v Northwest Indian Cemetery Protective Assn., 485 US 439, 451 [1988] [Free Exercise Clause did not preclude government logging and road construction activities on lands long used for religious purposes by Native American tribes]; see also Prince v Massachusetts, 321 US 158, 171 [1944] [holding that child labor laws can be enforced against a mother who used her children to distribute religious literature]), or the deeply held belief of religious individuals that compliance would make them a party to immoral or sinful behavior (see Gillette v United States, 401 US 437, 461 [1971] [sustaining the military Selective Service System against the claim that it violated free exercise by conscripting persons opposed to a particular war on religious grounds]; see also United States v Lee, 455 US 252, 258-261 [1982] [concluding people whose religious beliefs prohibited the payment of Social Security taxes could be required to pay them]). To hold otherwise would be "a constitutional anomaly," would "court[ ] anarchy," and would "make the professed doctrines of religious belief superior to the law of the land," effectively {**42 NY3d at 224}"permit[ing] every citizen to become a law unto himself"[FN4] (Smith, 494 US at 879, 886, 888).
The Court in Fulton expressly chose not to overrule Smith (see 593 US at 533) or the precedents it cites in which government action burdening religious beliefs or practices were upheld. Instead, Fulton provided elaboration as to a particular circumstance in which a law does not qualify as "generally applicable." In Fulton, because the City of Philadelphia's contractual nondiscrimination clause vested a city commissioner with "sole discretion" to grant an exception to an agency for rejecting a prospective foster family based on sexual orientation, the Court held the City's policy to not be generally applicable (id. at 535, 536). Fulton suggests two different ways in which a governmental policy will fail the test for general applicability and trigger strict scrutiny under the Free Exercise Clause: (1) a law cannot invite "the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions"; and (2) a law cannot prohibit "religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way" (id. at 533-534 [internal quotation marks omitted]). The Court resolved Fulton under the first of those tests, holding that the City's nondiscrimination policy incorporated an entirely discretionary " 'mechanism for individualized exemptions' " (id. at 533, quoting Smith, 494 US at 884) that invited "the government to decide which reasons for not complying with the policy are worthy of solicitude . . . at the Commissioner's 'sole discretion' " (id. at 537).
Turning back to Serio, in 2006, this Court held that the New York State Legislature's Women's Health and Wellness Act (WHWA) contraceptive insurance mandate's burden was the[*6]"incidental result of a 'neutral law of general applicability' " (7 NY3d at 522). The WHWA is designed to advance women's{**42 NY3d at 225} health and the equal treatment among genders and requires an employer's health insurance contract to provide coverage for the cost of contraceptive drugs or devices if the contract provided coverage for prescription drugs (see id. at 518; Insurance Law § 3221 [l] [16]). The statute provides an exemption for "religious employers" who requested an insurance contract without coverage for contraceptive methods that were contrary to the "religious employer's" religious tenets, whereupon the insurer would be obligated to offer contraception coverage to individual employees who may purchase it at their own expense (Serio, 7 NY3d at 519; Insurance Law § 3221 [l] [16] [A], [B] [i]). A "religious employer" is statutorily defined, and an entity had to meet four criteria to qualify (Serio, 7 NY3d at 519; Insurance Law § 3221 [l] [16] [A] [1]). The statutory definition of "religious employer" challenged in Serio is identical to the regulatory "religious employer" definition challenged here.
In Serio, applying Smith and Church of Lukumi, we rejected the free exercise challenge, holding that the four-factor test delineating a "religious employer" for the purposes of the statute met the "neutral law of general applicability" test (Serio, 7 NY3d at 522). However, our analysis of the issue focused on the concept of neutrality.[FN5] Because Fulton appears to treat neutrality and general applicability as analytically distinct concepts (but see Church of Lukumi, 508 US at 531 ["(n)eutrality and general applicability are interrelated"]), and because Serio does not discuss general applicability, our task is to determine whether the "religious employer" exemption meets either of Fulton's general applicability tests. We conclude that the regulatory definition for "religious employer" set forth by DFS is generally applicable within the meaning of Fulton.
B.
In Fulton, the City of Philadelphia stopped referring children to Catholic Social Services (CSS)—one of more than 20 foster care agencies in the City—after discovering that CSS would not certify same-sex couples to be foster parents due to its religious beliefs about marriage (Fulton, 593 US at 526-527). CSS and others challenged the City's referral freeze as a violation of the Federal Free Exercise Clause (id. at 531). In its defense, the City explained that CSS's refusal "to certify same-{**42 NY3d at 226}sex couples violated a non-discrimination provision in its contract with the City" (id.). The provision stated, in relevant part, that a provider "shall not reject a child or family . . . for Services based upon . . . their . . . sexual orientation . . . unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion" (id. at 535). The Court held that provision incorporated a "system of individualized exemptions" (id.) and such an "inclusion of a formal system of entirely discretionary exceptions . . . render[ed] the contractual non-discrimination requirement not generally applicable" (id. at 536). Analogizing it to the unemployment benefits system with a "good cause" exemption at issue in Sherbert v Verner (374 US 398 [1963]), the Court concluded that Philadelphia's non-discrimination policy "invite[d] the government to decide which reasons for not complying with the policy [we]re worthy of [*7]solicitude . . . at the Commissioner's sole discretion" (Fulton, 593 US at 537 [internal quotation marks omitted]), which made it not generally applicable and subject to strict scrutiny.
The "formal system of entirely discretionary" "individual exemptions" (id. at 536, 535) invalidated in Fulton is fundamentally different from the four regulatory factors establishing the religious exemption challenged in this case.[FN6] Fulton scrupulously adopted phrases from Smith—"a mechanism for individualized exemptions" (id. at 533, quoting Smith, 494 US at 884) and "a system of individual exemptions" (id. at 534, quoting Smith, 494 US at 884)—instead of simply saying "exemptions." Thus, Fulton advises that when exemptions are "individual" or "individualized," they cannot be characterized as "generally applicable." Importantly, Philadelphia's system of "individual exemptions" failed Fulton's general applicability test because the exemptions were "at the 'sole discretion' of the Commissioner" (id. at 535, 536, 537).
Courts have cautioned that individualized exemptions "create[ ] the risk that administrators will use their discretion to exempt individuals from complying with the law for secular{**42 NY3d at 227} reasons, but not religious reasons" (We the Patriots USA, Inc. v Hochul, 17 F4th 266, 288 [2d Cir 2021]). "Placing unbridled discretion in the hands of a government official or agency" has long been understood as highly problematic in the First Amendment context generally (City of Lakewood v Plain Dealer Publishing Co., 486 US 750, 757 [1988]; see also id. at 755-757; Shuttlesworth v Birmingham, 394 US 147, 153 [1969]; Forsyth County v Nationalist Movement, 505 US 123, 129 [1992]).
There are fundamental differences between the purely discretionary system of exemptions in Fulton and the "religious employer" exemption at issue here. The decision to grant or deny the exemption here is not "at the sole discretion" of any single person or authority, but rather is determined by enumerated factors. The "religious employer" exemption is not subject to the discretionary determination by a municipal official that allows the government to consider the reasons for the person's conduct and whether noncompliance with the policy is "worthy of solicitude" (Fulton, 593 US at 537). Instead, a "religious employer" is defined by objective criteria delineated in the regulation itself and once met, the employer may claim the exemption.
The medically necessary abortion coverage requirement uniformly applies to all policies in New York State that provide hospital, surgical, or medical expense coverage (see 11 NYCRR 52.16 [o] [1]), with the exception of a "religious employer" who requests an exemption (id. § 52.16 [o] [2]; see also 185 AD3d at 17). There is no individualized discretionary process whereby DFS or the Superintendent may grant or deny an entity's exemption. As in Serio, an entity can qualify for [*8]an exemption by meeting the four factors for a "religious employer" and then requesting said exemption from its insurance carrier.[FN7] It is then the insurance carrier, not DFS, who issues a rider for individual coverage (see 11 NYCRR 52.16 [o] [2]). Thus, exemptions are not available for "good cause," as prohibited in Sherbert, nor does DFS or the insurance carrier have the authority to grant an exemption in its sole discretion as prohibited in Fulton.{**42 NY3d at 228}
The federal appellate courts have interpreted Fulton to hold that an exception based upon objective criteria is not subject to strict scrutiny (see e.g. 303 Creative LLC v Elenis, 6 F4th 1160, 1187 [10th Cir 2021] ["Conversely, an exemption is not 'individualized' simply because it contain(s) express exceptions for objectively defined categories of persons" (some internal quotation marks and citation omitted)], revd on other grounds 600 US 570 [2023]). As the Tenth Circuit in Elenis observed, "[w]hile of course it takes some degree of individualized inquiry to determine whether a person is eligible for even a strictly defined exemption, that kind of limited yes-or-no inquiry is qualitatively different from the kind of case-by-case system envisioned by the Smith Court in its discussion of Sherbert and related cases" (id. [internal quotation marks and citation omitted]).
In contrast, federal precedent that deals with case-by-case exceptions are subject to strict scrutiny pursuant to the Federal Free Exercise Clause. In Dahl v Board of Trustees of W. Michigan Univ. (15 F4th 728, 733 [6th Cir 2021]), a University's vaccine mandate policy provided that " 'all student-athletes' must provide proof of at least one dose of a COVID-19 vaccine 'to maintain full involvement in the athletic department.' But '[m]edical or religious exemptions and accommodations will be considered on an individual basis' " (emphasis added). The University also retained "discretion to extend exemptions in whole or in part" which is ultimately why the Sixth Circuit held the policy to be "not generally applicable" under Fulton (id.). Similarly, in Kane v De Blasio (19 F4th 152, 169 [2d Cir 2021]), because an arbitration procedure for a religious accommodation to a COVID-19 vaccine mandate was subject to an arbitrators' "substantial" discretionary review and the criteria was inconsistently applied, the Second Circuit held that the procedure failed the test for general applicability.
Here, the "religious employer" exemption "does not give government officials discretion to decide whether a particular individual's reasons for requesting exemption are meritorious" (We the Patriots USA, Inc. v Connecticut Office of Early Childhood Dev., 76 F4th 130, 150 [2d Cir 2023]). Like the exemption in We the Patriots USA, Inc., entitlement to the exemption here has nothing to do with an individualized discretionary consideration of the reason why the employer seeks the accommodation. [*9]An insurance carrier grants an exemption to an entity that requests a contract without coverage for medically{**42 NY3d at 229} necessary abortions and provides an "annual certification" that it is a "religious employer" as defined by the four objective criteria (see 11 NYCRR 52.16 [o] [2] [i]).[FN8] That process does not assess the reason why an entity is seeking an exemption. Instead, the decision to grant an exemption fits squarely within the "yes-or-no inquiry" that is different in kind from a standardless case-by-case system prohibited by Fulton (see 303 Creative LLC, 6 F4th at 1187).
The same can be said about meeting the four factors defining a "religious employer." Plaintiffs contend that the "religious exemptions qualifying criteria" are not objective but rather "embed[ ] numerous discretionary judgments" in an adjudicator determining whether the organization qualifies or not. They claim that whether an organization "primarily" serves "persons who share the religious tenets of the entity" is a determination that is "far from objective where an organization routinely interacts with different individuals in different capacities" in addition to making an adjudicator "identify both a required level of belief and a required quantum of common beliefs" in discerning which individuals sufficiently "share the religious tenets of the entity." Instead, plaintiffs claim, resolving whether an entity qualifies under the four criteria for a "religious employer" requires an "individualized determination that leaves substantial room for discretion."
Although the factual question of whether a particular entity meets the regulatory definition can be the subject of dispute, that cannot be sufficient to render a regulation lacking in general applicability. Of course, any statutory or regulatory term must be interpreted, but if that rendered a provision discretionary and unable to survive general applicability within the meaning of Fulton, it is hard to imagine any scheme that would be nondiscretionary; in at least some cases there would be a question as to whether conduct met the terms of the provision. Plaintiffs themselves cite the federal contraception religious exemption as an example of a statute that passes the test for general applicability (45 CFR 147.132 [a] [2]). The language plaintiffs tout as consistent with the Free Exercise Clause—"[t]he exemption . . . will apply to the extent that an entity described in . . . this section objects, based on its sincerely{**42 NY3d at 230} held religious beliefs"—contains words that are subject to different interpretations, vesting the same type of discretion plaintiffs challenge here in whomever is charged with deciding what is a belief, whether that belief is religious, and whether it is sincerely held (id. [emphasis added]).
Thus, unless we are either prepared to say that no one claiming a religious belief may be subjected to any law inconsistent with that belief, or are prepared to say that the only way to define which beliefs can be regulated is to leave it up to the regulated individual—both of which would contravene Smith and more than a century of federal free exercise jurisprudence (see 494 US at 879; Gillette, 401 US at 461 ["Our cases do not at their farthest reach support the proposition that a stance of conscientious opposition relieves an objector from any colliding duty fixed by a democratic government"]; Reynolds v United States, 98 US 145, 166-167 [1879] ["Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every [*10]citizen to become a law unto himself"])—society must have some way to create regulatory and statutory definitions that meet the general applicability test.
The proposition that a state has the authority to cabin, through specific criteria, who qualifies as a "religious employer" is consistent with Supreme Court and other state court precedent (see Larson v Valente, 456 US 228, 255 n 30 [1982] [a state may require organizations "claiming the benefits of (a) religious-organization exemption" from a regulatory statute "to prove that (it) is a religious organization within the meaning of the (statute)" (emphasis added)]; see also Catholic Charities of Sacramento, Inc. v Superior Court, 32 Cal 4th 527, 551, 85 P3d 67, 83 [2004] ["To accomplish th(e) purposes (of proving an organization is a religious entity within the meaning of a statute) without explicitly defining the religious groups and practices to be accommodated, in order to distinguish them from secular groups and practices not entitled to accommodation, would often be impossible"]). The complaint that some criteria are hard to determine is not a claim about lack of general applicability, nor is the claim that some are so onerous as to burden religious exercise impermissibly. For example, plaintiffs' argument that the exemption would fail to reach a convent that ministers to the poor without regard to their religion does not demonstrate a lack of general applicability, because the{**42 NY3d at 231} failure to qualify under the regulatory rubric does not invite the "government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions" (Fulton, 593 US at 533 [internal quotation marks and citations omitted]).
It is always possible to imagine improvements to statutory or regulatory language that would make it clearer to resolve anticipated or theorical problems. But we decline to engage in a searching analysis as to whether the factors used in the "religious employer" definition are the most careful and narrowly tailored as can be envisioned, as that would effectively incorporate strict scrutiny through the back door. The purpose of the general applicability test is to decide whether a law must be subjected to strict scrutiny in the first instance.
Accordingly, the "religious employer" exemption survives the first test of general applicability described by Fulton. Qualifying as a "religious employer" requires application of specific criteria, not a standardless system of discretionary case-by-case evaluations. Neither an entity's decision to claim the exemption nor an insurer's determination as to an entity's satisfaction of the criteria invites "the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions" (592 US at 533 [internal quotation marks omitted]).
C.
The "religious employer" exemption also does not violate the Free Exercise Clause by permitting comparable secular conduct—Fulton's second test for general applicability whereby a law cannot prohibit "religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way" (593 US at 534).
Here, secular employees must comply with the insurance mandate for medically necessary abortion services. Taking Fulton's test as written, New York State permits no secular conduct that undermines its interests in the insurance-based provision of medically necessary abortion services. It is also helpful to remember that the "religious employer" exemption is an attempt to ameliorate the burden posed on a class of entities that would likely be the most burdened by the mandate. The exemption provides a way to accommodate religious beliefs in some cases. In doing so, the regulation favors religious exercise rather than discriminates against it (see{**42 NY3d at 232} Serio, 7 NY3d at 522-[*11]523, quoting Catholic Charities of Sacramento, Inc., 32 Cal 4th at 551, 85 P3d at 83 ["The high court has never prohibited statutory references to religion for the purpose of accommodating religious practice. To the contrary, the court has repeatedly indicated that it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions" (internal quotation marks and citations omitted)]).
Plaintiffs do not point to any secular employers who are exempt from complying with the mandate; thus, they cannot show that New York has undermined its interest in the mandate by its treatment of secular employers. Instead, they advance a novel argument, seeking to extend the language in Fulton to a different situation: one in which the comparison is not of religious versus secular employers, but among different types of religious employers. Plaintiffs rely heavily on Tandon v Newsom to argue for that extension of Fulton's language (593 US 61 [2021 per curiam] [granting motion for injunctive relief pending appeal]). In Tandon, the Supreme Court explained that a government regulation is not neutral or generally applicable if it treats "any comparable secular activity more favorably than religious exercise," with comparability "judged against the asserted government interest that justifies the regulation" (id. at 62 [emphasis omitted]; see also Roman Catholic Diocese of Brooklyn v Cuomo, 592 US 14, 16-19 [2020 per curiam] [applying the same principle to grant injunctive relief pending appeal]; Kennedy v Bremerton School Dist., 597 US 507, 527 [2022] [citing to Fulton for that principle and applying it to the application of disciplinary directives]).
Plaintiffs argue that Tandon should not be limited to comparable secular conduct that results in distinctions between secular and religious conduct, but should be extended to distinctions drawn among religious entities. In doing so, plaintiffs argue that Fulton is implicated because the "religious employer" exemption expressly exempts "some religious organizations but not others." They contend that an exemption that applies to organizations for which "the purpose of the entity" is "inculcation of religious values" only if the entity "primarily employs" and "primarily serves persons who share the religious tenets of the entity" bears no relationship to any of the State's purported interests in mandating insurance coverage for medically necessary abortions. Instead, they claim that these{**42 NY3d at 233} criteria reflect only "the State's decision that the religious beliefs of certain entities are more 'worthy of solicitude' than the religious beliefs of other entities." In effect, plaintiffs aver that the State's discrimination of certain entities that exercise their religion in a manner the State does not "prefer" is the type of conduct that Fulton expressly forbids. That argument is without merit.
First, the Supreme Court's remand order does not ask or authorize us to innovate existing Supreme Court doctrine. Plaintiffs' proposed extension of Tandon is not supported by any case law, which instead focuses exclusively on distinctions between secular and religious conduct. Thus, as it stands, the existence of a "religious employer" exemption that does not extend to all possible religious entities does not implicate any rule concerning general applicability.
Second, the deviation from Fulton's language that plaintiffs advocate for is really an argument that the "religious employer" exemption is not neutral,[FN9] because it targets certain beliefs [*12]and activities and not others (see Church of Lukumi, 508 US at 533 ["if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral"]). But neutrality is not before us on remand from the Supreme Court.[FN10]
The creation of any religious accommodation necessarily requires the government to distinguish the types of entities or activities that are covered from those that are not. Although a State may not distinguish between religious denominations or entangle itself in assessments regarding "the centrality of particular beliefs or practices to a faith" (see Smith, 494 US at 887; see also Catholic Charities of Sacramento, Inc., 32 Cal 4th at 546, 85 P3d at 80 [making a similar point]), that is not what the regulation's definition of a "religious employer" does.
{**42 NY3d at 234}As we explained in Serio, qualification as a "religious employer" depends on "the nature of [an employer's] activities" and business structure, not its "denominations" or beliefs (see 7 NY3d at 529). The parallel regulation here similarly does not differentiate among religious beliefs; instead, it differentiates between religious and nonreligious entities. For example, a person having two part-time jobs, one cleaning the floors of a Catholic church and one cleaning the floors of a soup kitchen run by a Catholic charity that serves all people, may be entitled to obtain insurance covering medically necessary abortions from one but not the other. Nothing about that situation disfavors any religion based on its beliefs; it differentiates between employers and the type of entity.
Accordingly, the "religious employer" exemption is generally applicable under both tests delineated in Fulton. Fulton therefore does not undermine Serio in any manner that affects the disposition of this case.
D.
For the first time in a supplementary brief to the Appellate Division on remand from the Supreme Court, plaintiffs raised an additional argument about general applicability. Plaintiffs argue that because the medically necessary abortion regulation does not apply to employers who self-insure, who provide no employee health insurance at all, or address the coverage needs of those who are not employed, there are "holes" that defeat the general applicability of the regulation, making it subject to strict scrutiny. Plaintiffs argue that these "holes" in the coverage effectively exempt secular employers from the coverage requirement, while simultaneously declining to exempt comparable religious employers. DFS responds that plaintiffs miss the point of the regulation, which is limited in scope to employers who obtain group health insurance policies issued or delivered in New York State. This argument, raised for the first time in plaintiffs' reply brief on remand to the [*13]Appellate Division, is not preserved for our review (see People v Baumann & Sons Buses, Inc., 6 NY3d 404, 407, 408 [2006]).
III.
The sole issue on remand is whether Fulton disturbs our holding in Serio when evaluating DFS's promulgation of a "religious employer" exemption pursuant to the Free Exercise Clause. Although Fulton provides a new articulation of the{**42 NY3d at 235} tests for general applicability, and although Serio did not turn on general applicability, Fulton's articulation does not mean that the parallel "religious employer" exemptions here and in Serio are unconstitutional. Accordingly, the Appellate Division order should be affirmed, without costs.
Judges Rivera, Garcia, Singas, Cannataro, Troutman and Iannacci[FN*] concur. Judge Halligan took no part.
Order affirmed, without costs.

Footnotes

Footnote 1:In Serio, we also rejected the plaintiffs' free exercise challenge under article I, § 3 of New York State's Constitution, though we did not interpret our Constitution's clause using Smith's rubric (see 7 NY3d at 525).

Footnote 2:As of September 2017, "medically necessary abortions" as defined in the Model Language included, among other things, "abortions in cases of rape, incest or fetal malformation." That definition is a close iteration of the Model Language issued by the Department of Financial Services in 2015 and 2016, which informed the basis of plaintiffs' challenge in their first action.

Footnote 3:While this case was pending before the Appellate Division on remand, the legislature enacted a statute codifying the regulation's mandate (see Insurance Law §§ 3221 [k] [22]; 4303 [ss]) and its "religious employer" exemption (see Insurance Law §§ 3221 [l] [16] [E] [1]; 4303 [cc] [5] [A]).

Footnote 4:Indeed, the Supreme Court cautioned that this danger
"increases in direct proportion to the society's diversity of religious beliefs, and its determination to coerce or suppress none of them. Precisely because 'we are a cosmopolitan nation made up of people of almost every conceivable religious preference,' and precisely because we value and protect that religious divergence, we cannot afford the luxury of deeming presumptively invalid, as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order" (494 US at 888 [citation omitted], quoting Braunfeld v Brown, 366 US 599, 606 [1961]).

Footnote 5:That is unsurprising as the Serio plaintiffs made only a passing reference to general applicability.

Footnote 6:As noted, the regulatory definition of "religious employer" challenged here is identical to the statutory definition of "religious employer" challenged in Serio. That Serio addressed a statute and we now address a regulation is a distinction "of no moment, as it is well settled that a properly promulgated regulation is entitled to the same deference as a legislative act" (185 AD3d at 17, citing Raffellini v State Farm Mut. Auto. Ins. Co., 9 NY3d 196, 201 [2007]). Thus, our analysis and holding apply equally to the regulatory and statutory factors delineating a "religious employer."

Footnote 7:The contraceptive insurance requirement in Serio applied uniformly to all insurance policies providing drug coverage except to those who sought accommodations as a "religious employer" as defined by statute (see 7 NY3d at 519-520). There was no discretionary mechanism for the Superintendent to grant or deny an exemption on an individualized basis. Exemptions were given to those who met the statutory factors for a "religious employer" and who then applied for such an exemption.

Footnote 8:The record here is devoid of direct evidence of the procedure for how exemptions are considered because plaintiffs opted to bring a pre-enforcement challenge to the regulation.

Footnote 9:Plaintiffs' argument also conflates the first and second Fulton tests of general applicability by invoking the individualized exemption "worthy of solicitude" language in their claim. Additionally, their argument sounds more like the Establishment Clause argument raised in Serio that is not at issue here (see 7 NY3d at 528-529 ["Plaintiffs contend that the legislation is invalid under Larson because it distinguishes between religious organizations that are exempt from the contraception requirements and those that are not"]).

Footnote 10:Moreover, by choosing to bring a pre-enforcement challenge, plaintiffs have avoided providing details about whether they qualify for the "religious employer" exemption or, if not, which criteria they fail to satisfy. That information is obviously essential to proper assessment of their argument that they are being treated differently from a comparable group.

Footnote *:Designated pursuant to NY Constitution, article VI, § 2.